IN THE UNITED STATES DISTRICT COURT FOR THE RECEIVED
MIDDLE DISTRICT OF ALABAMA
~~SOUTHERN~~ DIVISION
NORTHERN

2006 SEP 18 P 1: 34

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

| | |
|---|---|
| PAM G. POTTER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| WYETH, et al., | ) |
| | ) |
| Defendants. | ) |

Civil Action No. 2:06 CV 837 - WKW

## NOTICE OF REMOVAL

COMES NOW Wyeth, a defendant in the above-styled cause, and gives notice that this

cause is hereby removed from the Circuit Court of Covington County, Alabama to the United

States District Court of the Middle District of Alabama, Southern Division. As and for its Notice

of Removal, Wyeth shows unto the Court as follows:

1.     This lawsuit is a civil action within the meaning of the Acts of Congress relating

to removal of cases. Plaintiff instituted this civil action in the Circuit Court of Covington County,

Alabama, on August 17, 2006 against Wyeth and Joe H. Kelly said case number being CV-06-

165 in said court.

2.     Plaintiff alleges that she suffers from a variety of health problems as a result of

her ingestion of the diet drugs, fenfluramine (Pondimin) and dexfenfluramine (Redux).

Complaint at ¶¶ 2, 56.

3.     The complaint was filed on August 17, 2006. According to the records of the



Circuit Court of Covington County, Wyeth was served on August 21, 2006. The clerk's records do not reflect any service on Mr. Kelly at this time. A true and correct copy of all process and pleadings served on Wyeth, is attached hereto as Exhibit A. Because this Notice of Removal is filed within thirty days after service of the summons and/or complaint upon the first-served defendant, it is timely under 28 U.S.C. §1446(b).

4.      This action originally could have been filed in this Court under 28 U.S.C. § 1332 because complete diversity of citizenship exists between the properly joined parties, and the amount in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

## I.
## COMPLETE DIVERSITY OF CITIZENSHIP EXISTS BETWEEN THE PROPERLY JOINED PARTIES

5.      Plaintiff is, and was at the institution of this civil action, and at all times intervening, a citizen and resident of Alabama. Complaint at ¶ 2.

6.      Wyeth is, and was at the time of the institution of this civil action, and at all times intervening, a corporation organized and existing under and by virtue of the laws of the State of Delaware, having its principal place of business in the State of New Jersey. As a result, Wyeth is not now, and was not at the time of the filing of the Complaint, a citizen or resident of the State of Alabama within the meaning of the Acts of Congress relating to the removal of causes.

7.      Plaintiff purports to state claims against Joe H. Kelly, the only non-diverse defendant. According to the complaint, Mr. Kelly marketed, promoted, sold and/or distributed Pondimin and/or Redux. Complaint at ¶ 4. As the Eleventh Circuit recently noted under virtually identical circumstances, there is no reasonable possibility that plaintiff can prevail on her claims against Mr. Kelly. *Legg v. Wyeth*, 428 F.3d 1317 (11th Cir. 2005) (reversing an award

2

of costs on the grounds that Wyeth's removal based on the fraudulent joinder of one of its sales

representatives was "valid and reasonable"). Thus, he has been fraudulently joined, and his

citizenship must be disregarded for the purposes of determining jurisdiction.

## II.
## MR. KELLY HAS BEEN FRAUDULENTLY JOINED

### A. The Fraudulent Joinder Standard

8.     In this Circuit, the fraudulent joinder standard is as follows:

> Joinder has been deemed fraudulent in [three] situations. The first is when there is
> no possibility that the plaintiff can prove a cause of action against the resident (non-
> diverse) defendant . . . . The second is when there is outright fraud in the plaintiff's
> pleading of jurisdictional facts . . . . In *Tapscott*, 77 F.3d at 1355 (11th Cir. 1996)
> (*rev'd on other grounds*), a third situation of fraudulent joinder was identified – i.e.,
> where a diverse defendant is joined with a nondiverse defendant as to whom there is
> no joint, several or alternative liability and where the claim against the diverse
> defendant has no real connection to the claim against the nondiverse defendant.

*Triggs v. John Crump Toyota, Inc.*, 154 F.3d 1284, 1287-89 (11th Cir. 1998) (internal citations

omitted) (emphasis added). While this standard is described as requiring that a defendant

establish that there is no possibility that the plaintiff might prevail against a non-diverse

defendant, courts reject the suggestion that "'any mere theoretical possibility of recovery under

local law . . . suffices to preclude removal.'" *Travis v. Irby*, 326 F.3d 644, 648 (5th Cir. 2003).

Indeed, the Eleventh Circuit in *Legg* recently applied the "no reasonable possibility" standard and

specifically noted that the "potential for legal liability 'must be reasonable, not merely

theoretical.'" *Legg*, 428 F.3d at 1325, n.5.    Numerous circuits have recognized that the standard

is more correctly described as requiring a showing that there is *no reasonable basis* for

predicating liability against the fraudulently joined defendant. *Travis*, 326 F.3d at 648.  *See also*

*In re Rezulin Prods. Liab. Litig.*, 133 F.Supp. 2d 272, 280 n.4 (explaining same); *Crowe v.*

3

*Coleman*, 113 F.3d 1536, 1540 (11th Cir. 1997) (applying "arguably a reasonable basis" test) (quoting *Bobby Jones Garden Apartments v. Suleski*, 391 F.2d 172, 177 (5th Cir. 1968)); *BP Chems. Ltd. v. Jiangsu Sopo Corp.*, 285 F.3d 677, 685 (8th Cir. 2002) (applying "reasonable basis" test); *Schwartz v. State Farm Mut. Auto. Ins. Co.*, 174 F.3d 875, 879 (7th Cir. 1999) (noting that it cannot "say that there is no possibility that a state court would someday" recognize plaintiff's liability theory, but upholding removal because that currently "is not a reasonable possibility"); *Boyer v. Snap-On Tools Corp.*, 913 F.2d 108, 111 (3d Cir. 1990) (applying "reasonable basis" test); *see also Woods v. Firestone Tire & Rubber Co.*, 560 F. Supp 588, 590 (S.D. Fla. 1983) (applying "arguably reasonable basis" test); *TKI, Inc. v. Nichols Research Corp.*, 191 F. Supp. 2d 1307, 1313-14 (M.D. Ala. 2002) (applying "reasonable basis" test); *Anderson v. Allstate Life Ins. Co.*, No. 00-0958, 2001 WL 228057, *8 (S.D. Fla. Feb. 1, 2001) (same); *El Chico Rest. Inc. v. Aetna Sur. & Cas. Co.*, 980 F. Supp. 1474, 1478-79 (S.D. Ga. 1997) (same).

**B.     Plaintiff Cannot Prevail on Any of Her Claims Against Mr. Kelly.**

9.     Without making any distinction between Wyeth and Mr. Kelly, plaintiff asserts that "Defendants" are liable under the Alabama Extended Manufacturer Liability Doctrine ("AEMLD") (Count I), and for breach of warranty (Count III), negligence (Count IV), wantonness (Count V), failure to warn (Count II), and fraud, misrepresentation and suppression (Count VI). Plaintiff cannot maintain any of these claims against Mr. Kelly. *See* Affidavit of Joe Kelly attached collectively Exhibit B.

10.     First, Mr. Kelly cannot be held liable under the AEMLD (Count I) because he did not sell or supply Pondimin or Redux. *See In re Rezulin Prods. Liab. Litig.*, 133 F. Supp. 2d 272, 287 (S.D.N.Y. 2001) ("*Rezulin* I") (applying Alabama law) (pharmaceutical representatives

4

are not sellers or suppliers of the prescription drug they represent); *Devise v. Kenmore*, CV

03-J-943-S at 2 (N.D. Ala. May 12, 2003) (sales representative at Sears is not a seller under the

AEMLD) (Exhibit C hereto); *Bowman v. Coleman Co., Inc.*, No. 96-0448-P-C, Slip. Op. at 8

(S.D. Ala. Sept. 3, 1996) (retail store manager is not a "seller;" "neither the applicable case law

nor the policy objectives articulated by Alabama and other state courts can support the extension

of the AEMLD to encompass [employees of the seller or supplier].") (Exhibit D hereto).

11.    For the same reason, plaintiff cannot maintain a claim against Mr. Kelly for

breach of warranty (Count III). *See* Ala. Code §§ 7-2-313(1) & 7-2-314(1) (2002) (both express

and implied warranty claims refer to the creation of warranties by the "seller"); *Rezulin I,* 133 F.

Supp. 2d at 286 ("seller" who makes warranties about a prescription medicine is the

"pharmaceutical manufacturer," and not the professional representative).

12.    Plaintiff's claims for negligence and wantonness (Counts VI and V), failure to

warn (Count II) and fraud, misrepresentation and suppression (Count VI) also fail.  The crux of

all of these claims is that Wyeth and Mr. Kelly failed to disclose to the alleged prescribing

physicians that diet drugs cause valvular heart disease ("VHD"), the injuries of which plaintiff

complains and, because of her participation in Wyeth's settlement, the only damages at issue

here. Plaintiff cannot maintain any of these claims against Mr. Kelly.

13.    The alleged misrepresentation at issue here is the failure of "persons", Mr. Kelly,

to have disclosed an association between VHD and these drugs (which was unknown to Wyeth at

the time, although that issue is assumed against Wyeth for purposes of the instant proceeding).

Here, the affidavit of Mr. Kelly (attached hereto as Exhibit B) makes clear that he did not know

of this danger! A corporation can only act through its employees, because a corporation is a legal

5

fiction. The acts of a corporate employee are the acts of the corporation. *See, e.g. Phillips v. Amoco Oil Co.*, 614 F. Supp. 694, 703 n. 10 (N.D. Ala. 1985), *aff'd.*, 799 F.2d 1464 (11th Cir. 1986), *cert. denied*, 481 U.S. 1016 (1987) (corporation cannot conspire with its employees because the acts of the employee are the acts of the corporation).

14.     Any finding to the contrary of that well-established Alabama doctrine would in effect hold a corporate employee strictly liable, even if he was unaware of the dangers of VHD and even if he did nothing more than hand to the doctor the printed materials prepared by Wyeth and approved by the Food and Drug Administration, which had found these drugs safe only shortly before the representative's visit to the prescribing physician. In this exact context, the Eleventh Circuit has noted that Alabama law requires that a corporate employee personally participate in the corporate wrongdoing. *Legg v. Wyeth*, 428 F.3d 1317, 1324 (11th Cir 2005). *See also, e.g., Devise v. Kenmore, Inc.*, Civil Action No. 03-J-943-S, Slip Op. at 7-8 (N.D. Ala. May 12, 2003) (applying Alabama law and finding that an appliance salesman had no duty of disclosure to the plaintiff for an alleged defect in the product) (Exhibit C hereto); *Bowman v. Coleman Co.*, Civil Action No. 96-0448-P-C, Slip Op. at 8-11 (S.D. Ala. Sept. 3, 1996) (Magistrate Report and Recommendation) (Exhibit D hereto) (declaring fraudulently joined a salesman of a heater who allegedly advised the purchaser-plaintiff that it was "a good heater" and that he "would not experience any problems with it;" court reasoned that the salesman could have no personal liability on a negligence or wantonness theory, because the salesman owed no duty to the plaintiff to prevent the heater from entering the stream of commerce and because the salesman lacked the training and expertise to perform an inspection as to the safety of the heater); *Mills v. Wex-Tex Industries*, 991 F. Supp. 1370, 1381-82 (M.D. Ala.1997) (employee not

individually liable absent allegation of personal participation in alleged tortious conduct); *see also Candy H. v. Redemption Ranch, Inc.,* 563 F.Supp. 505, 513 (M.D. Ala. 1983); (same); *Turner v. Hayes*, 719 So. 2d 1184, 1188 (Ala. Civ. App. 1997) ("corporate employees are liable personally for the wrongful action of the company or its other employees only if they personally participate in the tort"), *rev'd in part on other grounds sub nom. Ex parte Atmore Community Hosp.,* 719 So. 2d 1190 (Ala. 1998).

15.    Alabama's law of innocent misrepresentation does not impose liability on one who merely transmits information, absent bad faith on the part of the messenger. *Legg v. Wyeth*, 428 F.3d 1317, 1324 (11th Cir 2005) (finding no reasonable possibility that a Wyeth sales representative could be held liable for innocent misrepresentation where the sales representative submitted an affidavit denying pre-publicity knowledge of VHD, identical to the one Mr. Kelly submits here).    For example, in *Fisher v. Comer Plantation, Inc*., 772 So.2d 455, 463 (Ala. 2000), the Alabama Supreme Court recognized that "those who are only conduits through which faulty information is supplied by one person to a third person cannot be liable for fraud [including innocent fraud] unless they acted in bad faith." Based on this logic, the *Fisher* Court affirmed summary judgment in favor of a real estate agent, who merely passed along faulty information to a purchaser plaintiff. *Id.* at 463. *See also Speigner v. Howard*, 502 So.2d 367 (Ala. 1987) (same; real estate agent not liable for misrepresentation, including innocent fraud, merely for transmitting inaccurate information to plaintiff-purchaser, there being no evidence that agent transmitted this information in bad faith).    It follows that corporate employees are not liable for fraud (including innocent misrepresentation) under Alabama law merely for passing on

information about a product provided to them by their corporate employer, without any fault whatsoever on the part of the salesman.

16.     To the extent that plaintiff alleges that Mr. Kelly is liable for suppression for failing to disclose to the alleged prescribing physicians that diet drugs cause valvular heart disease, the injuries of which plaintiff complains, Alabama law is clear that the local sales representatives had to have had actual knowledge of the danger of valvular heart disease and its materiality in order to be held liable. *Hardy v. Blue Cross & Blue Shield*, 585 So.2d 39, 32 (Ala. 1991) (citing Cherokee *Farms, Inc. v. Firemen's Fund Ins. Co*., 526 So.2d 871 (Ala.1988); *Wilson v. Brown*, 496 So.2d 756 (Ala.1986); *Harrell v. Dodson*, 398 So.2d 272 (Ala.1981)). *See also University Federal Credit Union v. Grayson*, 878 So. 2d 280, 288 (Ala. 2003) (same). Here the affidavit of Mr. Kelly is **unrefuted** – he simply did not know about such dangers! Exhibit B hereto.  As such, he had no duty to disclose the risk of valvular heart disease, about which he knew nothing.

17.     Plaintiff's allegation that Mr. Kelly represented to the alleged prescribing doctors that the diet drugs were safe and effective (Complaint at ¶¶ 67, 84) is simply another way of saying that Mr. Kelly did not disclose the risk of valvular heart disease, as that is the risk that plaintiff claims rendered the drug unsafe.  Thus, the essence of plaintiff's claim is that Mr. Kelly did not disclose a risk he had no duty to disclose.  Moreover, the FDA determined that the drugs were safe and effective in allowing the drugs to be put on the market, and as recently as in June, 1996 for Redux.  Thus, taking plaintiff's allegations as true, Mr. Kelly was only repeating what had to be true for the drugs to be allowed to be sold.  To the extent that plaintiff's fraud claim is that Mr. Kelly misrepresented that the diet drugs were safe and effective, this FDA finding

8

cannot rise to the level of puffery, much less fraud.

18.     Plaintiff also cannot prevail on a fraud claim because she has failed to plead fraud with particularity.  *Compare* Fed. R. Civ. P. 9(b) (requiring that allegations of fraud be stated with particularity), *with* Ala. R. Civ. P. 9(b), Comment (stating that the Alabama Rule is identical to the federal rule).

### III.
### THE AMOUNT-IN-CONTROVERSY
### REQUIREMENT IS SATISFIED HERE.

19.     Among other claims, plaintiff asserts claims for negligence, breach of warranty, and fraud under the Alabama law.  Plaintiff alleges, among other things, injury to her hearts and pulmonary systems. Complaint at ¶¶ 56, 65, 70, 76, 82, 93.  Although the complaint does not specify a monetary demand, plaintiff seeks compensatory damages relating to alleged heart valve damage, mental anguish, past and future medical expenses and decreased life expectancy.  *See* Complaint at ¶¶ 56, 65, 70, 76, 82, 93.  Accordingly, the amount in controversy exceeds $75,000.00, exclusive of interests and costs.  *See, e.g, Tapscott*, 77 F.3d at 1359 (11th Cir. 1996) (when plaintiffs make an unspecified claim for damages, removing party need only show by a preponderance of the evidence that amount in controversy exceeds jurisdictional limit).  Cases in Alabama similar to plaintiff's case have resulted in verdicts and settlements exceeding $75,000.  *See* Exhibit E hereto.

### IV.
### THE OTHER PREREQUISITES FOR
### REMOVAL HAVE BEEN SATISFIED.

20.     As set forth above, this Notice of Removal is filed within thirty days of the service of the petition or process upon the first-served defendant.

9

21.     All properly joined and served defendants consent to and join in this Notice of

Removal.  Fraudulently joined parties, such as Mr. Kelly, need not join in a Notice of Removal.

*See Sideritis v. State of Indiana*, 830 F.Supp. 1156, 1159, 1160 (N.D. Ind. 1993); *Moore v.*

*Interstate Fire Ins. Co.*, 717 F.Supp. 1193, 1995 (S.D. Miss. 1989).

22.     Defendants have sought no similar relief.

23.     The prerequisites for removal under 28 U.S.C. § 1441 have been met.

24.     If any question arises as to the propriety of the removal of these actions, Wyeth

requests the opportunity to present a brief and oral argument in support of its position that this

case is removable, and to conduct jurisdictional discovery.

WHEREFORE, Wyeth, desiring to remove this case to the United States District Court

for the Middle District of Alabama, Southern Division, being the district and division of said

Court for the County in which said actions are pending, prays that the filing of this Notice of

Removal with the Clerk of the Circuit Court of Covington County, Alabama shall effect the

removal of said suit to this Court.

EDWARD S. SLEDGE, III          (SLE003)
FORREST C. WILSON, III         (WIL141)
FREDERICK G. HELMSING, JR.     (HEL014)
Attorneys for Defendant Wyeth

OF COUNSEL:

**MCDOWELL KNIGHT**
**ROEDDER & SLEDGE, L.L.C.**
Post Office Box 350
Mobile, Alabama 36602
(251) 432-5300

10

## CERTIFICATE OF SERVICE

I hereby certify that I have this _18_ day of September, 2006, served a true and correct copy of the foregoing on below-listed counsel of record in this proceeding, by United States mail, properly addressed and first class postage prepaid.

**COUNSEL OF RECORD:**

Robert J. Morris
Garry S. McAnnally
Morris & McAnnally
10365 Holtville Road
Deatsville, Alabama 36022

11

IN THE CIRCUIT COURT OF
COVINGTON COUNTY, ALABAMA

PAM G. POTTER, an individual;                    )
                                                 )
        Plaintiff,                               )
                                                 )        CIVIL ACTION NO.: $CV-06-165$
vs.                                              )
                                                 )
                                                 )

WYETH, a corporation; JOE H. KELLY, an individual; Fictitious parties Defendant, A, B, C, D,
& E, being the correct name of any of the aforementioned Defendants who are known only to
Plaintiffs by the name(s) listed above; F, G, H, I, and J, being those persons, entities and/or
individuals, whether singular or plural, who or which manufactured certain drugs known as
Pondimin and Redux; K, L, M, N, and O, being those persons, entities or individuals, whether
singular or plural, who or which marketed, promoted, distributed, sold or had any role in the
distributive chain regarding the diet-drugs made the basis of this suit, including, but not limited
to, marketing, promoting, advertising, distributing, and/or selling said diet drugs as the agent,
servant or employee of WYETH, or in the capacity of sales representative disseminating
information to physicians or their representative staff, or pharmacist or their representative staff
concerning, among other things, the safety, efficacy and/or use of the diet-drugs made the basis of
this suit; P, Q, R, S, and T, being those persons, entities or individuals, whether singular or plural,
who or which sold, distributed, marketed or had any role in the distributive chain regarding the
diet-drugs made the basis of this suit, including, but not limited to, marketing, promoting,
advertising, distributing, and/or selling said diet drugs as the agent, servant or employee of any
named or fictitiously described Defendant, in any capacity including that of sales representative
disseminating information to physicians or their representative staff, or pharmacist or their
representative staff concerning, among other things, the safety, efficacy and/or use of the diet-
drugs made the basis of this suit; U, V, and W, being those persons, entities or individuals,
whether singular or plural, other than those named or fictitiously described Defendants described
above, which are the successors in interest of any of those entities described above. (Plaintiffs
avers that the identities of the fictitious parties Defendant herein are otherwise unknown to the
Plaintiffs at this time or, if their names are known to Plaintiffs, their identities as proper parties
Defendant are not known to Plaintiffs at this time, and their true names will be substituted by
amendment when ascertained.

                                                 )
                                                 )
        Defendants.                              )        FILED IN OFFICE

                                                          AUG 17 2006

                                                          Roy A Pınell
                                                          CLERK



# SUMMONS

This service by certified mail of this Summons is initiated upon the written request of Plaintiff's attorney pursuant to Rule 4.1(c) of the Alabama Rules of Civil Procedure.

NOTICE TO:            **WYETH INC.**
                      **CSC Lawyers Incorporating Service**
                      **150 South Perry Street**
                      **Montgomery, Alabama 36104**

      The Complaint which is attached to this Summons is important and you must take immediate action to protect your rights. You are required to mail or hand deliver a copy of a written Answer, either admitting or denying each allegation in the Complaint to Robert J. Morris, Attorney for the Plaintiff, whose address is: 10365 Holtville Road, Deatsville, Alabama 36022. THIS ANSWER MUST BE MAILED OR DELIVERED WITHIN THIRTY (30) DAYS, OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT. You must also file the original of your Answer with the Clerk of this Court within a reasonable time.

Dated this *17th* day of *August*, 2006.

*Roger A. Powell*
     Clerk of Court

## RETURN ON SERVICE:

\_\_\_\_\_     Return receipt of certified mail received in this office on _____ .

\_\_\_\_\_     I certify that I personally delivered a copy of the Summons and Complaint to
    _____ in _____ County, Alabama on
    _____ .

_____    _____
Date                                   Server's Signature

_____    _____
(Address of Server)                          Type of Process Server

_____

**FILED IN OFFICE**

AUG 17 2006

*Roger A. Powell*
**CLERK**

IN THE CIRCUIT COURT OF
COVINGTON COUNTY, ALABAMA

PAM G. POTTER, an individual;                )
                                             )
     Plaintiff,                              )
                                             )      CIVIL ACTION NO.: *CV-06-165*
vs.                                          )
                                             )
                                             )

WYETH, a corporation; JOE H. KELLY, an individual; Fictitious parties Defendant, A, B, C, D, & E, being the correct name of any of the aforementioned Defendants who are known only to Plaintiffs by the name(s) listed above; F, G, H, I, and J, being those persons, entities and/or individuals, whether singular or plural, who or which manufactured certain drugs known as Pondimin and Redux; K, L, M, N, and O, being those persons, entities or individuals, whether singular or plural, who or which marketed, promoted, distributed, sold or had any role in the distributive chain regarding the diet-drugs made the basis of this suit, including, but not limited to, marketing, promoting, advertising, distributing, and/or selling said diet drugs as the agent, servant or employee of WYETH, or in the capacity of sales representative disseminating information to physicians or their representative staff, or pharmacist or their representative staff concerning, among other things, the safety, efficacy and/or use of the diet-drugs made the basis of this suit; P, Q, R, S, and T, being those persons, entities or individuals, whether singular or plural, who or which sold, distributed, marketed or had any role in the distributive chain regarding the diet-drugs made the basis of this suit, including, but not limited to, marketing, promoting, advertising, distributing, and/or selling said diet drugs as the agent, servant or employee of any named or fictitiously described Defendant, in any capacity including that of sales representative disseminating information to physicians or their representative staff, or pharmacist or their representative staff concerning, among other things, the safety, efficacy and/or use of the diet-drugs made the basis of this suit; U, V, and W, being those persons, entities or individuals, whether singular or plural, other than those named or fictitiously described Defendants described above, which are the successors in interest of any of those entities described above. (Plaintiffs avers that the identities of the fictitious parties Defendant herein are otherwise unknown to the Plaintiffs at this time or, if their names are known to Plaintiffs, their identities as proper parties Defendant are not known to Plaintiffs at this time, and their true names will be substituted by amendment when ascertained.                                                    )

                                                  )
     Defendants.                             )

FILED IN OFFICE

AUG 17 2006

*Ray A Powell*
CLERK

# COMPLAINT

1.     This is a "Fen-Phen" diet-drug lawsuit. The Plaintiff is a Back-End Opt-Out of the

*Brown v. American Home Products* - Nationwide Class Action Settlement. A true and correct copy of

the plaintiffs' opt-out form is attached hereto as exhibit "A", and incorporated by reference into this

complaint the same as if fully set forth at length. **All prerequisites to opting out of the class action**

**settlement and filing an individual lawsuit have been met.**     FILED IN OFFICE

## PARTIES     AUG 17 2006

2.     Plaintiff, Pam G. Potter, is over nineteen (19) years of age and a resident of Covington
                                                                              CLERK

County, Alabama. Plaintiff was prescribed and did ingest the pharmaceutical drug fenfluramine, also

known as Pondimin, and/or dexfenfluramine, also known as Redux, which were manufactured,

packaged, marketed, promoted, distributed and/or sold by Defendants and/ their subsidiaries and/or

employees and/or agents.

3.     Defendant, WYETH, is the successor corporation to American Home Products

Corporation ("AHP"), Wyeth-Ayerst Laboratories Division of American Home Products Corporation

("Wyeth Labs"), and A. H. Robbins Company, Incorporation ("A. H. Robbins"), and is organized and

existing under the laws of the State of Delaware, and having its principal place of business in New

Jersey. WYETH[1] does business in the State of Alabama and, at all relevant times, was in the business of

promoting, marketing, manufacturing and distributing the pharmaceuticals fenfluramine and

dexfenfluramine in the State of Alabama.

4.     Defendant Joe H. Kelly is over the age of nineteen (19) and a resident of the State of

Alabama. At all times material hereto, the Defendant was in the business of marketing, promoting,

---

[1]"WYETH" and/or "WYETH Defendant" shall refer specifically to WYETH as the successor
corporation to American Home Products Corporation, Wyeth-Ayerst Laboratories Division of
American Home Products Corporation and A. H. Robins Company, Incorporation.

detailing, distributing and/or selling the pharmaceutical drugs Pondimin and/or Redux in the State of Alabama.

5.      Fictitious parties Defendants, A, B, C, D, & E, being the correct name of any of the aforementioned Defendants who are known only to Plaintiff by the name(s) listed above; F, G, H, I, and J, being those persons, entities and/or individuals, whether singular or plural, who or which manufactured certain drugs known as Pondimin and Redux; K, L, M, N, and O, being those persons, entities or individuals, whether singular or plural, who or which sold, distributed, marketed or had any role in the distributive chain regarding the diet-drugs made the basis of this suit, including, but not limited to, marketing, selling, advertising, distributing, and/or promoting said diet drugs as the agent, servant or employee of WYETH, or in the capacity of sales representative disseminating information to physicians or their representative staff, or pharmacist or their representative staff concerning, among other things, the safety, efficacy and/or use of the diet-drugs made the basis of this suit; P, Q, R, S, and T, being those persons, entities or individuals, whether singular or plural, who or which sold, distributed, marketed or had any role in the distributive chain regarding the diet-drugs made the basis of this suit, including, but not limited to, marketing, selling, advertising, distributing, and/or promoting said diet drugs as the agent, servant or employee of any named or fictitiously described Defendant, in any capacity including that of sales representative disseminating information to physicians or their representative staff, or pharmacist or their representative staff concerning, among other things, the safety, efficacy and/or use of the diet-drugs made the basis of this suit; U, V, and W, being those persons, entities or individuals, whether singular or plural, other than those named or fictitiously described Defendants described above, which are the successors in interest of any of those entities described above. (Plaintiff avers that the identities of the fictitious parties Defendant herein are otherwise unknown to the Plaintiff at this time or, if their names are known to Plaintiff, their identities as proper parties Defendant are not known to Plaintiff at this time, and their true names will be substituted by amendment when ascertained.)

## JURISDICTION AND VENUE

6.     The Court has jurisdiction over each Defendant because Defendant did business in Alabama, committed a tort in whole or in part in Alabama, is a resident and citizen of the State of Alabama, and/or has continuing minimum contacts with the State of Alabama. Each Defendant is amenable to service of process by an Alabama Court. This Court also has jurisdiction over the controversy because the damages are above the minimum jurisdictional amounts.

7.     Venue is proper in Covington County because Plaintiff resides in Covington County and one or more of the Defendants does business in and/or does business by agent in Covington County by promoting, detailing, distributing, selling, and/or marketing their products in Covington County.

8.     The basis of Plaintiff's claims include, but are not limited to:

    a.     Defendant Kelly and the Wyeth Defendant promoted, detailed, distributed, sold, and/or marketed and made representations to Dr. John William Sabatine regarding Pondimin and/or Redux. Dr. Sabatine was a practicing physician in Coffee County, Alabama.

    b.     Based on the representations made to Dr. Sabatine by Defendant Kelly and the Wyeth Defendant, through its agents, Plaintiff Potter was prescribed Pondimin and/or Redux.

    c.     Plaintiff was a patient of Dr. John William Sabatine.

    d.     Plaintiff was prescribed Pondimin and/or Redux by her physician.

9.     There is no basis for federal court jurisdiction over this matter:

    a.     Plaintiff has not pled nor does Plaintiff intend to plead any claim cognizable under federal law or any federal code, regulation, rule, statute, or otherwise;

    b.     There is no diversity of citizenship between Plaintiff and all Defendants;

    c.     Plaintiff is not in bankruptcy;

    d.     No Defendant may remove pursuant to the *All Writs Act*, because neither this lawsuit nor any of the Plaintiff's claims threaten to frustrate or damage the integrity of the *Brown v. American Home Products* - Nationwide Class Action Settlement; and/or

    e.     In the event any Defendant files a notice of removal, as has repeatedly been done in other lawsuits filed in state court, Plaintiff believes the removal will be

without any good faith legal basis or legal justification and will be entirely for the purpose of avoiding the jurisdiction of this Honorable Court. Plaintiff hereby gives notice that she will seek sanctions for any improper removal of this case by any Defendant under Rule 11 of the Alabama Rules of Civil Procedure.

## GENERAL FACTS AND ALLEGATIONS

10.    At all relevant times the Wyeth Defendant, itself, or by use of others, did manufacture, create, design, test, label, sterilize, package, distribute, supply, market, sell, advertise, and/or otherwise distribute, in interstate commerce the diet drugs Pondimin (fenfluramine) and Redux (dexfenfluramine). Fenfluramine and/or dexfenfluramine, both alone and in combination with phentermine, has been widely promoted by the Wyeth Defendant as effective and safe for weight loss.

11.    Plaintiff is complaining of injuries sustained as the result of the use of the weight loss prescription drug fenfluramine and/or dexfenfluramine.

12.    Fenfluramine was one of the drugs prescribed in combination and promoted and referred to as "Fen-phen." The Wyeth Defendant marketed fenfluramine under the trade name, Pondimin. In doing so, the Wyeth Defendant actively encouraged, and/or failed to effectively discourage, the combined use of fenfluramine with phentermine because they knew that the combined use would increase sales of fenfluramine.

13.    Dexfenfluramine is the $d$-isomer of fenfluramine, containing the same active ingredient as fenfluramine. The Wyeth Defendant marketed dexfenfluramine under the trade name Redux.

14.    Fenfluramine (Pondimin) and dexfenfluramine (Redux) were abruptly withdrawn from the market on September 15, 1997. Prior to that withdrawal, these drugs were sold to millions of people subjecting them to serious risk of bodily harm including, but not limited to, heart valve damage.

15.    The Wyeth Defendant has known the serious side effects of fenfluramine and/or dexfenfluramine for a substantial period of time. These side effects were known or should have been known to the Wyeth Defendant at the time that they marketed the drugs to the public based on, among other things, medical evidence of dangerous and potentially fatal side effects from the use of the drugs

in Europe and elsewhere, as detailed below. The Wyeth Defendant did not, however, conduct adequate testing to establish the safety of the drugs before marketing them. Rather, the Wyeth Defendant aggressively marketed the drugs and promoted their use, both individually and in combination with other drugs, while downplaying evidence of the serious and potentially fatal side effects that consumers of these drugs could face.

## MARKETING STRATEGY

16.    The Wyeth Defendant's marketing strategy, beginning in the early 1990s, was to aggressively market fenfluramine, often by encouraging combination use of the product with phentermine, by falsely misleading potential users about fenfluramine and by failing to protect users from serious dangers that the Wyeth Defendant knew or should have known could result from use of fenfluramine.

17.    The Wyeth Defendant widely and successfully marketed fenfluramine and/or dexfenfluramine in the United States.

18.    The Wyeth Defendant undertook a promotional campaign that included placement of numerous articles in scientific, medical and general interest magazines extolling the virtues of fenfluramine combined with phentermine in order to induce widespread use of the product. Many of these articles either cited or reported the results of studies that were funded by the Wyeth Defendant. Thus, the Wyeth Defendant actively encouraged, or failed to effectively discourage, combinations of these drugs.

19.    Further, the Wyeth Defendant actively encouraged, or failed to effectively discourage, combinations of these drugs by employing and/or contracting with commission based salespersons to promote the widespread prescribing of fenfluramine and/or the combination of fenfluramine and phentermine to patients that were not clinically obese.

20.    The marketing program as a whole, by affirmative misrepresentations and/or omissions, falsely and fraudulently sought to create the image and impression that the use of fenfluramine, both

individually and/or in combination with phentermine, was safe for human use, had fewer side effects and adverse reactions than other methods of weight loss, constituted a convenient, safe form of weight loss and would not interfere with daily life.

21.     The Wyeth Defendant purposefully downplayed and understated the health hazards and risks associated with fenfluramine and/or dexfenfluramine.

22.     The Wyeth Defendant falsely and fraudulently concealed relevant information from doctors and potential fenfluramine and/or dexfenfluramine users regarding the safety of fenfluramine and/or dexfenfluramine.

23.     In particular, the Wyeth Defendant's marketing efforts, as well as their product inserts, falsely, fraudulently and/or negligently misrepresented a number of facts regarding fenfluramine and/or dexfenfluramine, including, but not limited to, the following:

   a.     The presence of adequate testing of fenfluramine and the presence of adequate testing of any combination use of the product with phentermine;

   b.     Fenfluramine and/or dexfenfluramine's efficacy including, but not limited to the severity, frequency and discomfort of side effects and adverse health effects caused by the drugs; and/or

   c.     The relative risks associated with the drugs including, but not limited to, the prevalence of valvular heart disease.

24.     Additionally, the Wyeth sales representatives owed various duties to the Plaintiff but breached those duties by committing positive tortious actions against the Plaintiff. Those positive tortious acts by the Wyeth sales representatives were committed in their individual and/or corporate capacity and include, but are not limited to, the following:

   a.     Failed to convey adequate warnings to the Plaintiff through the prescribing physician(s);

   b.     Were in the business of marketing, promoting, selling, advertising and/or distributing the unreasonably dangerous pharmaceutical drugs Pondimin and/or Redux which have caused harm to the Plaintiff;

c.    Negligently marketed, promoted, sold, advertised and/or distributed the unreasonably dangerous pharmaceutical drugs Pondimin and/or Redux;

d.    Made negligent and/or wanton misrepresentations regarding the safety and efficacy of the unreasonably dangerous pharmaceutical drugs Pondimin and/or Redux;

e.    Negligently and/or wantonly failed to provide sufficient instructions to the Plaintiff and/or Plaintiff's prescribing physician(s) regarding the use of said drugs, alone or in combination;

f.    Possessed actual or constructive knowledge of the dangerous condition of the drugs made the basis of this suit and intentionally, deliberately, negligently, and/or wantonly withheld this information from prescribing physician(s), dispensing pharmacists, and the end users of the drugs, including the Plaintiff; and/or

g.    Possessed actual or constructive knowledge of adverse drug reports (ADR) regarding the drugs made the basis of this suit but continued to market, promote, advertise, distribute, and/or profit from the sale of these drugs.

## EFFECTS OF USE

### Primary Pulmonary Hypertension

25.    In 1965, the diet drug Aminorex was introduced in Europe. Aminorex was touted as a wonder weight loss drug that worked by increasing brain serotonin and inhibiting re-uptake of serotonin. However, by 1967 evidence began to surface that the ingestion of Aminorex was associated with pulmonary hypertension ("PH"). Over the next six years, an Aminorex epidemic raged in Europe. There was a ten-fold increase in primary pulmonary hypertension ("PPH") cases. Half of the patients died within ten years and the rest of the patients suffered significant oxygen deprivation and are debilitated for the remainder of their lives. Aminorex was removed from the European market in 1972. The Wyeth Defendant knew, or should have known, of the European experience with Aminorex and how it would relate to Wyeth Defendant's drugs Pondimin and Redux three (3) decades later.

26.    In 1973, Pondimin was introduced into the United States market. Pondimin is a fenfluramine drug and is in the same family of drugs as Aminorex, and is very similar to Aminorex. Pondimin was touted as a wonder weight loss drug that worked by increasing brain serotonin and

inhibiting re-uptake of serotonin. However, because the drug when used alone made users lethargic and tired, sales of Pondimin languished.

27.    On October 3, 1981, Dr. J.G. Douglas published "Pulmonary Hypertension and Fenfluramine"in the *British Medical Journal*. On January 25, 1986 an article entitled "Irreversible Pulmonary Hypertension after Treatment with Fenfluramine", was published in the *British Medical Journal*. The Wyeth Defendant knew, or should have known, of the British Medical Journal articles and how those articles related to their drug Pondimin a decade later.

28.    In 1984, Dr. Michael Weintraub published "A Double-Blind Clinical Trial in Weight Control: Use of Fenfluramine and Phentermine Alone and in Combination" in the *Archives of Internal Medicine*. Dr. Weintraub's study was supported by A.H. Robins (which was later acquired by Wyeth). Despite noting some adverse effects associated with fenfluramine, Dr. Weintraub entirely failed to examine the long-term safety of fenfluramine. Instead, the study focused on the short-term effectiveness of the drugs used individually, and in combination.

29.    In 1992, Dr. Weintraub published a series of articles in Clinical Pharmacological Therapies, in which he reported his research regarding the long term use of fenfluramine and phentermine for weight control. Dr. Weintraub's research was supported by the Wyeth Defendant.

30.    Dr. Weintraub's research assumed the safety of fenfluramine, and did not examine the short-term or long-term safety of the drug. Further, the Wyeth Defendant failed to conduct or fund any studies or research regarding the long-term safety of the fenfluramine drug, Pondimin. Nevertheless, the Wyeth Defendant did promote to physicians and the public Dr. Weintraub's conclusion that long term combination use of fenfluramine and phentermine was effective for the management of obesity.

31.    By 1993, the Wyeth Defendant labeling for Pondimin indicated that there were only 4 reported cases of pulmonary hypertension reported in association with the drug. Yet, that same year, Dr. Francois Brenot published "Primary Pulmonary Hypertension and Fenfluramine Use", in the *British Heart Journal*. Dr. Brenot identified 25 cases of primary pulmonary hypertension associated with the

use of fenfluramine and/or dexfenfluramine. The Wyeth Defendant knew or should have known of the Brenot article. Wyeth should have known by at least 1993 that Pondimin was defective and unreasonably dangerous. Wyeth should have known by at least 1993 that AHP's labeling of Pondimin was false.

32.    On June 24, 1994, Wyeth Safety Surveillance Monitor, Amy Myers, wrote a memo to Wyeth Medical Monitor, Fred Wilson, and indicated that Wyeth's database contained 37 cases of primary pulmonary hypertension associated with Pondimin. Further, in February 1994, the preliminary results of the International Primary Pulmonary Hypertension study ("IPPH Study") entitled "Appetite Suppressants and the Risk of Primary Pulmonary Hypertension" was released and available to the Wyeth Defendant. The preliminary results of the IPPH Study confirmed the association between fenfluramine and dexfenfluramine, and pulmonary hypertension and primary pulmonary hypertension. The Wyeth Defendant concealed the number of cases of primary pulmonary hypertension associated with Pondimin that the Wyeth Defendant knew existed in order to continue to market Pondimin for profit.

33.    On June 15, 1995 Wyeth's James Ottinger, reported to Joseph Bathish the status of the European Committee on Proprietary Medicinal Product's ("CPMP") pharmacovigilance discussion, wherein the CPMP working party concluded that a causal relationship between anorectic agents, like fenfluramine and/or dexfenfluramine, and the occurrence of primary pulmonary hypertension had been established.

34.    The August 26, 1996 issue of the New England Journal of Medicine reported the final results of IPPH Study, which had been preliminarily released in February 1994. The IPPH Study concluded that fenfluramine-based anorexigens, such as fenfluramine and dexfenfluramine, increased the risk of PPH by a multiple of more than 23 times.

35.    The Wyeth Defendant was aware of the result of the IPPH study by at least February 1994. Nevertheless, the Wyeth Defendant failed to apprise the public or physicians that the risk of

contracting PH or PPH was many, many multiples of that previously reported by the AHP in their literature. Even after the Brenot article and the preliminary release of the IPPH Study, the Wyeth Defendant failed to remove Pondimin from the market when Wyeth knew of the extreme danger, causal relationship and substantial risk of harm associated with the use Wyeth's drug Pondimin.

36.     The Defendants continued to promote Pondimin after learning of the extreme dangers associated with it. The Defendants continued to promote Pondimin knowing the drug had no beneficial use. The AHP labeling on the drug was totally inadequate to alert prescribing physicians and patients of the actual PH or PPH danger and risk associated with its fenfluramine drug, Pondimin. The Defendants knew that danger and that risk.

37.     Even after they knew of the danger, the Wyeth Defendant did not remove Pondimin from the market and did not do any further testing of the drug. Instead, the Defendants continued to market the drug to prescribing physicians like the physician that prescribed the diet drugs to the Plaintiffs in this case.

38.     Further, in 1996 the Wyeth Defendant introduced their dexfenfluramine drug, Redux into the U.S. market. This, despite the fact that the Wyeth Defendant knew of the danger and risks of valvular heart disease and primary pulmonary hypertension associated with Pondimin.

39.     The Defendants did not adequately or appropriately disclose fenfluramine and/or dexfenfluramine information or related drug information to physicians in the United States. Instead the Defendants fraudulently concealed the pulmonary hypertension or primary pulmonary hypertension danger they knew of from physicians. As a result, physicians over-prescribed Wyeth's fenfluramine and/or dexfenfluramine drugs, Pondimin and Redux, to patients who were grossly under-informed regarding the risk of PH or PPH associated with the drugs.

40.     Although the FDA approved phentermine and fenfluramine separately, the FDA never approved the drugs for combined use. The Defendants knew of and encouraged the prevalence of off-label combined use of their drugs, and failed to adequately and appropriately warn physicians and

consumers that the combination drug regimen was not FDA approved, was hazardous due to the presence of fenfluramine, was not recommended and had not been systematically tested by appropriate clinical trials. Further, the Defendants concealed, destroyed and removed written evidence and/or misrepresented evidence supporting the association between PH and/or PPH with fenfluramine and/or dexfenfluramine.

41.    The Defendants failed to fully and adequately warn doctors, the public and/or the Plaintiff about the serious health risks from Pondimin and Redux.

### Valvular Heart Dysfunction

42.    In the early 1990s, the Wyeth Defendant received reports of valvular heart disease in patients taking fenfluramine and/or dexfenfluramine. However, the Wyeth Defendant failed to investigate the matter and failed to code their Adverse Drug Event reports appropriately so that valvular heart disease could be properly tracked and monitored. The Wyeth Defendant failed to conduct further testing of AHP's drug Pondimin even after they knew of reports of valvular heart disease. The Defendants continued to market their fenfluramine drug, Pondimin even after they knew of reports of valvular heart disease.

43.    In 1997, a Safety Surveillance Monitor working for the Wyeth Defendant fraudulently destroyed, removed and concealed written Adverse Drug Event reports in the Wyeth Defendant' database files that demonstrated the association between fenfluramine and/or dexfenfluramine and valvular heart disease by "deleting" and "re-coding" them. The Safety Surveillance Monitor deleted and re-coded the reports at the direction of the Wyeth Defendant' senior management.

44.    On or about July 8, 1997, the Mayo Clinic, located in Rochester, Minnesota, released an emergency report linking the use of fenfluramine to unusual, potentially life-threatening, valvular morphology and regurgitation in twenty-four (24) women. The report observed that cardiovascular testing procedures, principally the echocardiogram procedure, revealed that each of the 24 patients had

one or more heart valves that were thickened and that blood was regurgitating (or "leaking" backwards), making the heart work harder to pump blood throughout the body.

45.    In addition, the Mayo Clinic report observed that eight (8) of the patients had newly-documented pulmonary hypertension. Cardiac surgical intervention to replace bad valves was required in five of the twenty-four patients as of the date of the study.

46.    The emergency release of the Mayo Clinic study, well in advance of its scheduled publication in the *New England Journal of Medicine*, appears to have been motivated by the extraordinary incidence of life-threatening valvular heart disease and primary pulmonary hypertension experienced in persons who were taking fenfluramine.

47.    The Mayo Clinics' study concludes that fenfluramine users needed to be informed about the risks of pulmonary hypertension and valvular heart disease, particularly because these conditions are extremely rare in individuals under fifty (50) years old.

48.    Subsequent research suggests that pulmonary hypertension and/or valvular heart disease may exist in a very significant portion of those who took fenfluramine and/or dexfenfluramine and that some of those suffering pulmonary hypertension and/or valvular dysfunction may be totally asymptomatic.

49.    The Defendants knew, or should have known about the risk of valvular heart disease associated with use of fenfluramine and/or dexfenfluramine. Yet, the Defendants failed to warn physicians, patients, including the Plaintiff, about the risk of valvular heart disease. Further, the Wyeth Defendant destroyed, removed and concealed written evidence and/or misrepresented evidence supporting the association between valvular heart disease and Wyeth's fenfluramine (Pondimin) and dexfenfluramine (Redux). The misrepresentations include, but are not limited to, the deletion, destruction, removal, concealment, miscoding and re-coding of written Adverse Drug Event reports.

# COUNT I
## ALABAMA EXTENDED MANUFACTURER'S LIABILITY DOCTRINE

50.    Plaintiff restates each and every preceding allegation of this Complaint and incorporates each by reference as though set forth in full herein and further alleges as follows:

51.    At all times material hereto, the Defendants, individually and collectively, have engaged in the business of selling, distributing, supplying, manufacturing, marketing and/or promoting Pondimin and Redux, that was defective and unreasonably dangerous to the Plaintiff.

52.    At all times material hereto, the Pondimin and Redux sold, distributed, supplied, manufactured, marketed and/or promoted by the Defendants was expected to reach, and did reach the Plaintiff without substantial change in the condition in which it was sold.

53.    At all times material hereto, the Pondimin and Redux sold, distributed, supplied, manufactured, marketed and/or promoted by the Defendants was defective in design and unreasonably dangerous at the time it was placed in the stream of commerce in ways which include, but are not limited to, one or more of the following particulars:

   a.    When placed in the stream of commerce, the drug contained unreasonably dangerous design defects and were not reasonably safe as intended to be used, subjecting the Plaintiffs to risks which exceeded any benefits of the drug;

   b.    When placed in the stream of commerce, the drug was defective in design and formulation, making use of the drug more dangerous than an ordinary consumer would expect and more dangerous than other, alternative risks associated with obesity and/or weight loss;

   c.    The drug was insufficiently tested;

   d.    The drug was marketed and/or promoted to be used in a combination with the drug phentermine, which was known to the Defendants to cause harmful side effects which outweighed any potential utility;

   e.    The drug was not accompanied by adequate instructions and/or warnings to fully inform the Plaintiff of the full nature or extent of the risks and side effects associated with its use, thereby rendering the Defendants liable to the Plaintiff.

54.    The dangers and risks of harm posed by the drug were foreseeable and/or known to the Defendants. Moreover, the dangers and foreseeable risks of harm associated with the drug were sufficiently great in relation to the purported benefits of the drug, which were nonexistent or negligible, so that the drug could not have been properly prescribed any class of patients.

55.    But for the aforementioned defective and unreasonably dangerous conditions, the drug would not have been prescribed to the Plaintiff and the Plaintiff would not have sustained the injuries alleged herein.

56.    As a direct and proximate result of the defective condition of the drug, Plaintiff has sustained serious and permanent injuries and damages including, but not limited to:

a.    Injury to the heart;

b.    Injury to the pulmonary system;

c.    Other physical injuries;

d.    Past and future health expenses including, without limitation, the cost of consultations with physicians and other medical treatment;

e.    Physical and mental pain and suffering;

f.    Mental anguish;

g.    Loss of capacity for the enjoyment of life;

h.    Loss of the ability to earn money in the future; and

i.    Decreased life expectancy.

WHEREFORE, Plaintiff demands judgment against Defendants, both jointly and severally, for all applicable compensatory damages, pre-judgment and post-judgment interest, as well as all costs of this action including attorneys' fees, and a trial by jury of all issues to be tried.

## COUNT II
## FAILURE TO WARN

57.    Plaintiff restates each and every preceding allegation of this Complaint and incorporates each by reference as though set forth in full herein and further alleges as follows:

58.     The drug Pondimin was defective and unreasonably dangerous when it left the possession of the Defendants in that it contained warnings insufficient to alert the Plaintiff to the dangerous risks and reactions associated with the drug, including, but not limited to, pulmonary system injury, heart valve disorders, damage and disease, and/or other serious and life threatening side effects.

59.     The Plaintiff used the drug for it intended purpose; weight loss.

60.     The Plaintiff could not have discovered any defect in the drug through the exercise of reasonable care.

61.     The Defendants, as manufacturers, distributors, and/or sellers of pharmaceutical drugs, are held to the level of knowledge of an expert in the field.

62.     The Plaintiff did not have substantially the same knowledge as Defendants and no adequate warning was communicated to the Plaintiff.

63.     The warnings that were given by the Defendants to the Plaintiff were insufficient, inaccurate, and/or ambiguous.

64.     The Defendants had a continuing duty to warn the Plaintiff of the risks and dangers associated with the drug, which were foreseeable and/or known to the Defendants.

65.     As a direct and proximate result of the Defendants' failure to warn, Plaintiff has sustained serious and permanent injuries and damages including, but not limited to:

a.      Injury to the heart;

b.      Injury to the pulmonary system;

c.      Other physical injuries;

d.      Past and future health expenses including, without limitation, the cost of consultations with physicians and other medical treatment;

e.      Physical and mental pain and suffering;

f.      Mental anguish;

g.      Loss of capacity for the enjoyment of life;

h.    Loss of the ability to earn money in the future; and

i.    Decreased life expectancy.

WHEREFORE, Plaintiff demands judgment against Defendants, both jointly and severally, for all applicable compensatory damages, pre-judgment and post-judgment interest, as well as all costs of this action including attorneys' fees, and a trial by jury of all issues to be tried.

## COUNT III
## BREACH OF WARRANTY OF MERCHANTABILITY

66.    Plaintiff restates each and every preceding allegation of this Complaint and incorporate each by reference as though set forth in full herein and further alleges as follows:

67.    When Defendants placed the drug into the stream of commerce, they knew of the use for which the drug was intended and expressly and/or impliedly warranted to the Plaintiff that use of the drug was a safe and acceptable means of weight loss and weight control.

68.    The Plaintiff reasonably relied upon the expertise, skill, judgment, and knowledge of Defendants and upon the express and/or implied warranty that the drug was of merchantable quality and fit for use as an acceptable means of weight loss and weight control.

69.    The drugs were not of merchantable quality and were not safe or fit for intended use because the products were and are unreasonably dangerous and unfit for the ordinary purposes for which they were used, in that they caused injury to the Plaintiff. The Defendants breached said warranties because the drug were unduly dangerous and did cause injury to the Plaintiff.

70.    As a direct and proximate result of the Defendant's breach of these warranties, Plaintiff has sustained serious and permanent injuries and damages including, but not limited to:

a.    Injury to the heart;

b.    Injury to the pulmonary system;

c.    Other physical injuries;

d.    Past and future health expenses including, without limitation, the cost of consultations with physicians and other medical treatment;

e.    Physical and mental pain and suffering;

f.    Mental anguish;

g.    Loss of capacity for the enjoyment of life;

h.    Loss of the ability to earn money in the future; and

i.    Decreased life expectancy.

WHEREFORE, Plaintiff demands judgment against Defendants, both jointly and severally, for all applicable compensatory damages, pre-judgment and post-judgment interest, as well as all costs of this action including attorneys' fees, and a trial by jury of all issues to be tried.

## COUNT IV
## NEGLIGENCE

71.    Plaintiff restates each and every preceding allegation of this Complaint and incorporates each by reference as though set forth in full herein and further alleges as follows:

72.    Defendants, directly and/or indirectly, individually and collectively, negligently made, created, manufactured, assembled, designed, tested, labeled, supplied, packaged, distributed, promoted, marketed, advertised, warned, and/or sold, in the State of Alabama, the prescription drug Pondimin and/or Redux.

73.    At all times material hereto, Defendants had a duty to the Plaintiff to exercise reasonable care in the creation, manufacture, assembly, design, testing, labeling, supplying, packaging, distribution, promotion, marketing, advertising, warning, and/or sale of the drug Pondimin and/or Redux.

74.    Defendants breached that duty and were negligent in their actions, misrepresentations, and omissions toward the Plaintiff in the following ways:

a.    Failed to include adequate warnings with the drug that would alert the Plaintiff to the potential risks and serious side effects of the drug;

b.    Failed to adequately and properly test the drug before placing the drug on the market;

c.    Failed to conduct sufficient testing on the drug which, if properly performed, would have shown that the drug had serious side effects, including, but not limited to,

significant risk of pulmonary system injury, heart valve disorders, damage and disease, and/or other serious and life threatening side effects;

d.    Failed to adequately warn the Plaintiff that use of the drug should be accompanied by a professional medical examination and regularly scheduled follow-up examinations so that pulmonary system injury, heart valve disorders, damage and disease, and/or other serious and life threatening side effects could be avoided or detected early;

e.    Failed to adequately warn the Plaintiff that use of the drug carried a risk of temporary and/or permanent disability due to pulmonary system injury, heart valve disorders, damage and disease, and/or other serious and life threatening side effects;

f.    Failed to provide adequate post-marketing warnings or instructions after the Defendants knew or should have known of the significant risks of pulmonary system injury, heart valve disorders, damage and disease, and/or other serious and life threatening side effects;

g.    Failed to adequately warn the Plaintiff that the drug should not be prescribed for a long period of time and/or used in conjunction with other weight loss drugs including, but not limited to, phentermine;

h.    Failed to warn the Plaintiff that the use of the drug should be limited to those who specialized in the treatment of obesity;

i.    Failed to warn the Plaintiff that use of the drug should be limited to the morbidly obese and not used for cosmetic loss of weight;

j.    Failed to warn the Plaintiff that the drug would not substantially reduce weight or reduce weight for a long period of time;

k.    Failed to warn the Plaintiff that the combination use of the drug had not been studied as to safety in animals or humans; and

l.    Encouraged misuse and overuse while underplaying the side effects to the Plaintiff in order to make a profit from sales.

75.    Defendants knew or should have known that the drug caused unreasonably dangerous risks and serious side effects of which the Plaintiff would not be aware. Defendants nevertheless advertised, marketed, sold and/or otherwise distributed the drug knowing that there were safer methods and/or products for weight loss or weight control.

76.    As a direct and proximate result of the negligence and/or omissions of Defendants, Plaintiff has sustained serious and permanent injuries and damages including, but not limited to:

a.    Injury to the heart;

b.    Injury to the pulmonary system;

c.    Other physical injuries;

d.    Past and future health expenses including, without limitation, the cost of consultations with physicians and other medical treatment;

e.    Physical and mental pain and suffering;

f.    Mental anguish;

g.    Loss of capacity for the enjoyment of life;

h.    Loss of the ability to earn money in the future; and,

i.    Decreased life expectancy.

WHEREFORE, Plaintiff demands judgment against Defendants, both jointly and severally, for all applicable compensatory damages, pre-judgment and post-judgment interest, as well as all costs of this action including attorneys' fees, and a trial by jury of all issues to be tried.

## COUNT V
## WANTONNESS

77.    Plaintiff restates each and every preceding allegation of this Complaint and incorporates each by reference as though set forth in full herein and further alleges as follows:

78.    Defendants, directly and/or indirectly, individually and collectively, wantonly made, created, manufactured, assembled, designed, sterilized, tested, labeled, supplied, packaged, distributed, promoted, marketed, advertised, warned, and/or sold, in the State of Alabama, the drug Pondimin and Redux.

79.    At all times material hereto, Defendants had a duty to the Plaintiff not to wantonly create, manufacture, assemble, design, test, label, supply, package, distribute, promote, market, advertise, warn, and/or sell the drug Pondimin and/or Redux.

80.    Defendants breached that duty and were wanton in their actions, misrepresentations, and omissions toward the Plaintiffs in the following ways:

a.    Failed to include adequate warnings with the drug that would alert the Plaintiff to the potential risks and serious side effects of the drug;

b.    Failed to adequately and properly test the drug before placing the drug on the market;

c.    Failed to conduct sufficient testing on the drug which, if properly performed, would have shown that the drug had serious side effects, including, but not limited to, significant risk of pulmonary system injury, heart valve disorders, damage and disease, and/or other serious and life threatening side effects;

d.    Failed to adequately warn the Plaintiff that use of the drug should be accompanied by a professional medical examination and regularly scheduled follow-up examinations so that pulmonary system injury, heart valve disorders, damage and disease, and/or other serious and life threatening side effects could be avoided or detected early;

e.    Failed to adequately warn the Plaintiff that use of the drug carried a risk of temporary and/or permanent disability due to pulmonary system injury, heart valve disorders, damage and disease, and/or other serious and life threatening side effects;

f.    Failed to provide adequate post-marketing warnings or instructions after the Defendants knew or should have known of the significant risks of pulmonary system injury, heart valve disorders, damage and disease, and/or other serious and life threatening side effects;

g.    Failed to adequately warn the Plaintiff that the drug should not be prescribed for a long period of time and/or used in conjunction with other weight loss drugs including, but not limited to, phentermine;

h.    Failed to warn the Plaintiff that the use of the drug should be limited to those who specialized in the treatment of obesity;

i.    Failed to warn the Plaintiff that use of the drug should be limited to the morbidly obese and not used for cosmetic loss of weight;

j.    Failed to warn the Plaintiff that the drug would not substantially reduce weight or reduce weight for a long period of time;

k.    Failed to warn the Plaintiff that the combination use of the drug had not been studied as to safety in animals or humans; and

l.    Encouraged misuse and overuse while underplaying the side effects to the Plaintiff in order to make a profit from sales.

81.    Defendants knew or should have known that the drug caused unreasonably dangerous

risks and serious side effects of which the Plaintiffs would not be aware. Defendants nevertheless

advertised, marketed, sold and otherwise distributed the drug knowing that there were safer methods and/or products for weight loss or weight control.

82.    As a direct and proximate result of the wanton acts and/or omissions of Defendants, Plaintiff have sustained serious and permanent injuries and damages including, but not limited to:

a.    Injury to the heart;

b.    Injury to the pulmonary system;

c.    Other physical injuries;

d.    Past and future health expenses including, without limitation, the cost of consultations with physicians and other medical treatment;

e.    Physical and mental pain and suffering;

f.    mental anguish;

g.    Loss of capacity for the enjoyment of life;

h.    Loss of the ability to earn money in the future; and

i.    Decreased life expectancy.

WHEREFORE, Plaintiff demands judgment against Defendants, both jointly and severally, for all applicable compensatory damages, pre-judgment and post-judgment interest, as well as all costs of this action including attorneys' fees, and a trial by jury of all issues to be tried.

## COUNT VI
## FRAUD, MISREPRESENTATION AND SUPPRESSION

83.    Plaintiff restates each and every preceding allegation of this Complaint and incorporates each by reference as though set forth in full herein and further alleges as follows:

84.    Defendants fraudulently, intentionally and/or negligently misrepresented to the Plaintiff, the safety and effectiveness of the drug and/or fraudulently, intentionally, wantonly, and/or negligently concealed material information including adverse information regarding the safety and effectiveness of Pondimin and/or Redux.

85.    Defendants made misrepresentations and actively concealed adverse information at a time when the Defendants knew, or should have known, that Pondimin and/or Redux had foreseeable defects, dangers, and/or characteristics that were other than what the Defendants had represented to the Plaintiff.

86.    The misrepresentations and/or active concealment were perpetuated directly and/or indirectly by the Defendants.

87.    The Defendants knew or should have known that these representations were false and made the representations with the intent or purpose that the Plaintiff and/or Plaintiff's physician would rely on him, leading to the use of the drug by the Plaintiff.

88.    At the time of Defendant's fraudulent misrepresentations, the Plaintiff was unaware of the falsity of the statements being made and believed them to be true. Further, the Plaintiff has no knowledge of the information concealed and/or suppressed by Defendants.

89.    The Plaintiff justifiably relied on and/or was induced by the misrepresentations and/or active concealment and relied on the absence of safety information which the Defendants did suppress, conceal and/or fail to disclose to the Plaintiff's detriment.

90.    Defendants had a post-sale duty to warn the Plaintiff about the potential risks and/or complications associated with Pondimin and/or Redux in a timely manner.

91.    The misrepresentations of and/or active concealment by the Defendants constitute a continuing tort.

92.    Defendants, individually and collectively, made the misrepresentations and/or actively concealed this information with the intention and specific desire that the Plaintiff would rely on such information or the absence of such information in selecting the drug as treatment for weight loss.

93.    As a direct and proximate result of the fraudulent acts and omissions, suppression and misrepresentations of Defendants, Plaintiff has sustained serious and permanent injuries and damages including, but not limited to:

a.    Injury to the heart;

b.    Injury to the pulmonary system;

c.    Other physical injuries;

d.    Past and future health expenses including, without limitation, the cost of consultations with physicians and other medical treatment;

e.    Physical and mental pain and suffering;

f.    Mental anguish;

g.    Loss of capacity for the enjoyment of life;

h.    Loss of the ability to earn money in the future; and

i.    Decreased life expectancy.

WHEREFORE, Plaintiff demands judgment against Defendants, both jointly and severally, for all applicable compensatory damages, pre-judgment and post-judgment interest, as well as all costs of this action including attorneys' fees, and a trial by jury of all issues to be tried.

## COUNT VII
## FICTITIOUS PARTIES

94.    Plaintiff restates each and every preceding allegation of this Complaint and incorporates each by reference as though set forth in full herein.

95.    Plaintiff avers that the fictitious parties Defendant listed in this Complaint whose identities at this time are unknown are also liable to the Plaintiff, individually and collectively, under each and every count listed above.

96.    As a direct and proximate result of the actions, inactions, and/or omissions of the Fictitious Defendants, Plaintiff has sustained serious and permanent injuries and damages including, but not limited to:

a.    Injury to the heart;

b.    Injury to the pulmonary system;

c.    Other physical injuries;

d.    Past and future health expenses including, without limitation, the cost of consultations with physicians and other medical treatment;

e.    Physical and mental pain and suffering;

f.    Mental anguish;

g.    Loss of capacity for the enjoyment of life;

h.    Loss of the ability to earn money in the future; and

i.    Decreased life expectancy.

WHEREFORE, Plaintiff demands judgment against Defendants, both jointly and severally, for all applicable compensatory damages, pre-judgment and post-judgment interest, as well as all costs of this action including attorneys' fees, and a trial by jury of all issues to be tried.

## PLAINTIFF HEREBY DEMAND TRIAL BY STRUCK JURY

Robert J. Morris (MOR115)
Garry S. McAnnally (MCA024)
**MORRIS & McANNALLY, LLC**
10365 Holtville Road
Deatsville, Alabama 36022
Telephone:    (334) 569-1820
Facsimile:    (334) 569-1821

### SERVE DEFENDANTS VIA CERTIFIED MAIL AT:

WYETH, INC.
CSC Lawyers Incorporating Service
150 South Perry Street
Montgomery, AL 36104

Joe H. Kelly
734 Woodland Drive
Dothan, AL 36301

## ORANGE FORM #3

# BACK-END OPT-OUT FORM

# Diet Drug Settlement With Wyeth

If you qualify for a Back-End Opt-Out right under Section IV.D.4 of the Nationwide Settlement Agreement and you wish to exercise that right, you must be a Diet Drug Recipient or a Representative Claimant of a Diet Drug Recipient and use this ORANGE FORM #3.

To exercise a Back-End Opt-Out right based upon a Matrix-Level valvular condition: (1) the Diet Drug Recipient must have been diagnosed as FDA Positive or as having mild mitral regurgitation by January 3, 2003; (2) you must mail to the AHP Settlement Trust a BLUE FORM postmarked no later than May 3, 2003; and (3) the Diet Drug Recipient must have first reached a Matrix-Level valvular condition after September 30, 1999.

To register your intent to opt out as a Back-End Opt-Out, complete fully all sections of this form, sign it, date it, and mail the original to the AHP Settlement Trust and a copy to Wyeth at the addresses shown on page 2 of this form. *Both must be postmarked by the later of May 3, 2003, or 120 days after the date on which you first knew or should have known in the exercise of reasonable diligence that the relevant Diet Drug Recipient developed a Matrix-Level valvular condition.*

A Back-End Opt-Out right based upon Endocardial Fibrosis is subject to different deadlines and requirements, as set forth in the Settlement Agreement.

The Diet Drug Recipient or authorized Representative Claimant who wishes to opt out must sign this form personally. Attorneys may not sign this form on behalf of a client, unless the attorney qualifies as a Representative Claimant under Question #2 of this form.

1. State the name, address, Social Security Number, date of birth, telephone number, and Claim Number assigned to you by the AHP Settlement Trust, if any, for the relevant Diet Drug Recipient upon whom this opt-out is based.

   Pam (First Name)     G. (Middle Initial)     Potter (Last Name)

   15705 Old School Rd (Street Address)

   Opp (City)     AL (State)     36467- (Zip Code)

   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 (Social Security Number)     18300 – 822,750,1 (Claim Number)     08,14,1970 (Date of Birth MM/DD/YYYY)

   (334) 493-1861 (Daytime Area Code & Phone Number)     ( ) (Evening Area Code & Phone Number)

2. If you are completing this form as the Representative Claimant (*i.e.*, estate, administrator, or other legal representative, heir, or beneficiary of a Diet Drug Recipient) complete all of the following. You also must attach a copy of the order or document authorizing you to act as the Representative Claimant of the Diet Drug Recipient identified above.

   (First Name)     (Middle Initial)     (Last Name)

   (Street Address)

   (City)     (State)     (Zip Code)

   (Social Security Number)     18300 – (Claim Number)     (Date of Birth MM/DD/YYYY)

   ( ) (Daytime Area Code & Phone Number)     ( ) (Evening Area Code & Phone Number)

   (Your relationship to the Diet Drug Recipient)

ORANGE FORM #3 - 1



3.  If you have a lawyer who represents you in connection with the Diet Drug Litigation, list his/her name, office address, telephone number, fax number, and E-mail address, if any. If you do not have a lawyer, leave Question #3 blank.

Morris & McAnnally, LLC,
(Law Firm Name)

ROBERT        J.    MORRIS,
(First Name of Lawyer)    (Middle Initial)  (Last Name)

10365 Holtville Rd
(Street Address)

Deatsville                          AL      36022
(City)                              (State)  (Zip Code)

334569 1820                         334569 1821
(Daytime Area Code & Phone Number)  (Fax Area Code & Number)

Bobatmllc@aol.com
(E-mail Address, if any)

4.  CERTIFICATION: I have had an opportunity to read the Official Notice authorized by the Court in connection with the Final Judicial Approval of the Nationwide Class Action Settlement with American Home Products Corporation and to consult with physicians and attorneys concerning the terms and conditions of the Class Action Settlement. I HEREBY CERTIFY, SUBJECT TO PENALTIES OF PERJURY, THAT TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF, MY CIRCUMSTANCES QUALIFY ME TO EXERCISE A BACK-END OPT-OUT RIGHT UNDER THE SETTLEMENT AGREEMENT. I HEREBY KNOWINGLY AND PERMANENTLY RELINQUISH, WAIVE AND GIVE UP ALL OF THE RIGHTS, WHICH I WOULD OTHERWISE HAVE HAD AS A CLASS MEMBER UNDER THE SETTLEMENT AGREEMENT WITH AMERICAN HOME PRODUCTS CORPORATION, AND I AFFIRMATIVELY AND FOREVER OPT OUT OF THE CLASS WITH FULL KNOWLEDGE OF THE LEGAL, FACTUAL AND MEDICAL CONSEQUENCES OF MY ACTIONS.

This form is an official Court document sanctioned by the Court that presides over the Diet Drug Settlement and submitting it to the AHP Settlement Trust is equivalent to filing it with a Court. I declare under penalty of perjury that the information provided in this form is true and correct to the best of my knowledge, information and belief.



Pam Potter
(Signature of Diet Drug Recipient or Representative Claimant)

08 18 2005
(Date MM/DD/YYYY)

You must mail the original of this form to the AHP Settlement Trust and a copy of this form to Wyeth at the following addresses:

AHP Settlement Trust              Wyeth
P.O. Box 7939                     c/o Orran L. Brown
Philadelphia, PA 19101            BrownGreer PLC
                                  115 South 15th Street
                                  Suite 400
                                  Richmond, VA 23219-4209

For assistance call 1-800-386-2070 or access the AHP Settlement Trust website at http://www.settlementdietdrugs.com

ORANGE FORM #3 - 2



7004 0750 0000 2100 9207

Wyeth
CSC Lawyers Inc Service
150 S Perry Street
Montgomery. AL  36104

## AFFIDAVIT

Before me, a notary public in and for said County and State, personally appeared Joe H. Kelly, who being by me duly sworn, deposes on oath and says:

1.     My name is Joe H. Kelly.  I am over the age of twenty-one years and make this affidavit based upon my personal knowledge.

2.     I worked for Wyeth, formerly known as American Home Products Corporation, as a sales representative from 1991 until 2003.

3.     I never advertised, assembled, created, designed, detailed, distributed, labeled, made, manufactured, marketed, packaged, promoted, sold, sterilized, supplied, tested, or warranted Pondimin, or trained anyone to do so.  I never left samples of Pondimin with any healthcare provider.  I had no involvement in the development or preparation of package inserts for Pondimin, and had no control over the content of those inserts or over other written warnings related to that drug.  I sometimes answered questions from doctors about Pondimin, but I never promoted that drug.  Indeed, I had no reason to promote Pondimin because I received no credit or commission or bonus based on Pondimin sales.

4.     I never assembled, created, designed, distributed, labeled, made, manufactured, packaged, sold, sterilized, supplied, tested, or warranted Redux, or trained anyone to do so.  I never left samples of Redux with any healthcare provider.  I had no involvement in the development or preparation of package inserts for Redux, and had no control over the content of those inserts or over other written warnings related to that drug.

5.     As part of my duties, I detailed Redux to licensed healthcare providers.



6.    I was not aware of any alleged association between Pondimin and/or Redux and valvular heart disease until the time such an allegation was first publicized. I was not aware before that time of any study, report or other literature which claimed that an association exists between Pondimin and/or Redux and valvular heart disease or that anyone had alleged such an association. I was not aware of any information in Wyeth's possession concerning such an association. Thus, I could not have warned doctors or diet drug users of any alleged association between Pondimin and/or Redux and valvular heart disease. I never intentionally misrepresented the safety, efficacy or state of testing of Pondimin or Redux alone or in combination with phentermine to any licensed healthcare provider or to any diet drug user.

7.    I am not a medical doctor or pharmacist. I have no specialized medical or pharmacological education, except what I received from Wyeth. My knowledge of the drugs I detailed was derived primarily from Wyeth. Wyeth provided me with the FDA-approved package inserts and other information regarding the drugs I detailed, including Redux.

Sworn to and subscribed before me this _26_ day of April, 2004.

NOTARY PUBLIC
MY COMMISSION

EXPIRES: _1-26-08_

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

SHIRLEY and JOHN DEVISE,

     PLAINTIFFS,

vs.                    CASE NO. CV 03-J-943-S

KENMORE INC., et al.,

     DEFENDANTS.

## MEMORANDUM OPINION

ENTERED
MAY 1 2 2003

     This matter is before the court on the defendant Ned Bibb's motion to dismiss complaint (doc. 4); defendants Whirlpool Corporation ("Whirlpool") and Sears, Roebuck & Co. ("Sears") and Ned Bibb's notice of removal (doc. 1); the plaintiffs' opposition to defendant Ned Bibb's motion to dismiss (doc. 10) and the plaintiffs' brief in support of said opposition.

     Defendants removed this action from the Circuit Court of Jefferson County, Alabama, asserting that this court has jurisdiction under 28 U.S.C. § 1332. Notice of Removal, ¶ 3. Defendants allege that the matter in controversy exceeds $75,000.00 and it is between citizens of different states. Notice of Removal, ¶¶ 4, 5, 12, and 13. Although defendant Ned Bibb, an individual, is not diverse from the plaintiffs, defendants Whirlpool and Sears allege that Ned Bibb was fraudulently joined. Notice of Removal, ¶ 13.





On motions to dismiss, the court must take the facts of the complaint as true, and view those facts in the light most favorable to the nonmoving party. *Hawthorne v. Mac Adjustment, Inc.*, 140 F.3d 1367, 1370 (11th Cir.1998). The court finds such facts to be as follows:

The plaintiffs alleges they purchased a a Kenmore dishwasher from defendant Sears in October, 1999. That dishwasher caught fire in February, 2003, causing serious injuries to the plaintiffs.[1] Complaint, ¶ 13. Defendant Bibb was the salesman who sold the dishwasher in question to the plaintiffs. Complaint, ¶ 8. The plaintiffs bring claims under the Alabama Extended Manufacturers Liability Doctrine ("AEMLD") (Count I); negligent/wanton conduct (Count II); failure to warn (Count III); express or implied warranty (Count IV); a second AEMLD claim (Count V); and fraudulent suppression (Count VI).

On the face of the complaint, complete diversity, a prerequisite for jurisdiction under 28 U.S.C. § 1332, is lacking. "Diversity jurisdiction under 28 U.S.C. § 1332 requires complete diversity – every plaintiff must be diverse from every defendant." *Tapscott v. MS Dealer Service Corp.*, 77 F.3d 1353, 1359 (11th Cir.1996), *rev'd on other grounds, Cohen v. Office Depot, Inc.*, 204 F.3d 1069 (11th Cir. 2000). *See also*

---

[1]The parties do not dispute that the dishwasher in question was manufactured by defendant Whirlpool under the brand name "Kenmore."

*Carden v. Arkoma Associates*, 494 U.S. 185, 187, 110 S.Ct. 1015, 1017, 94 L.Ed.2d

615 (1990) ("Since its enactment, we have interpreted the diversity statute to require

'complete diversity' of citizenship); citing *Strawbridge v. Curtiss*, 3 Cranch 267, 2

L.Ed. 435 (1806). The only means by which this case may remain in this court is if

the lack of diversity which appears on the face of the complaint is through the

fraudulent joinder of the non-diverse party, as alleged by the defendant.

> Joinder has been deemed fraudulent in two situations. The first is when
> there is no possibility that the plaintiff can prove a cause of action
> against the resident (non-diverse) defendant. *Coker v. Amoco Oil Co.*,
> 709 F.2d 1433, 1440 (11th Cir.1983), *superceded by statute on other*
> *grounds as stated in Georgetown Manor, Inc. v. Ethan Allen, Inc.*, 991
> F.2d 1533 (11th Cir.1993). The second is when there is outright fraud in
> the plaintiff's pleading of jurisdictional facts. *Coker*, 709 F.2d at 1440....
> In *Tapscott*, 77 F.3d at 1355 (11th Cir.1996), a third situation of
> fraudulent joinder was identified--i.e., where a diverse defendant is
> joined with a nondiverse defendant as to whom there is no joint, several
> or alternative liability and where the claim against the diverse defendant
> has no real connection to the claim against the nondiverse defendant. *Id.*
> at 1360. In the instant case, the parties do not suggest that there has been
> "outright fraud in the plaintiff's pleading of jurisdictional facts," so we
> concern ourselves only with the first and third types of fraudulent
> joinder. Turning to the first type, "If there is *even a possibility* that a state
> court would find that the complaint states a cause of action against any
> one of the resident defendants, the federal court must find that the
> joinder was proper and remand the case to the state court." *Coker*, 709
> F.2d at 1440-41. The plaintiff need not have a winning case against the
> allegedly fraudulent defendant; he need only have a possibility of stating
> a valid cause of action in order for the joinder to be legitimate ....

*Triggs v. John Crump Toyota, Inc.*, 154 F.3d 1284, 1287 (11th Cir.1998).

3

The defendants, as the parties removing the action to federal court, have the burden to establish federal jurisdiction. *See Pacheco de Perez v. AT & T Co.*, 139 F.3d 1368, 1373 (11ᵗʰ Cir.1998); *Diaz v. Sheppard*, 85 F.3d 1502, 1505 (11ᵗʰ Cir.1996). All doubts (and uncertainties) about federal court jurisdiction must be resolved in favor of a remand to state court. *Burns v. Windsor Ins. Co.*, 31 F.3d 1092, 1095 (11ᵗʰ Cir.1994)); *Diaz*, 85 F.3d at 1505. "The burden of the removing defendant is a 'heavy one.' To determine whether the case should be remanded, the district court must evaluate the factual allegations in the light most favorable to the plaintiff and must resolve any uncertainties in favor of the plaintiff." *Crowe v. Coleman*, 113 F.3d 1536, 1538 (11ᵗʰ Cir.1997) (citation omitted).[2] The court can only grant the motion to dismiss the non-diverse defendant, and therefore retain jurisdiction, if "it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim which would entitle [them] to relief." *Hawthorne*, 140 F.3d at 1370.

---

[2]This court is cognizant of the Eleventh Circuit's admonition in *Burns v. Windsor Insurance Company*, 31 F.3d 1092, 1095 (11ᵗʰ Cir.1994), where the Court stated "Federal courts are courts of limited jurisdiction. While a defendant does have a right, by statute, to remove in certain situations, plaintiff is still the master of his own claim (citations omitted). Defendant's right to remove and plaintiff's right to chose his own forum are not on equal footing ... removal statutes are construed narrowly ... uncertainties are resolved in favor of remand (citations omitted)."

The court finds non-diverse defendant Bibb is named in two counts of the complaint – AEMLD (Count I) and fraudulent suppression (Count VI).[3]

Defendants assert that an individual sales representative cannot be held liable pursuant to the AEMLD. Additionally, defendants assert that the fraud claim in Count VI of the complaint is subsumed under the AEMLD, but if not subsumed, defendant Bibb had no duty to warn of any danger. Notice of Removal, ¶¶ 15-16. The plaintiffs respond that the complaint clearly states that defendant Bibb was the individual who sold the dishwasher to the plaintiffs. Opposition at 2. The plaintiffs then argue that "[h]ere there is doubt that the fraudulent suppression claim states a cause of action." Opposition at 4. The court can only assume that the plaintiffs meant to argue that "there is **NO** doubt that the fraudulent suppression claim states a cause of action."

The AEMLD establishes a cause of action against "a manufacturer, or supplier, or seller, who markets a product not reasonably safe when applied to its intended use in the usual and customary manner, constitutes negligence as a matter of law." *Casrell v. Altec Industries, Inc.*, 335 So.2d 128, 132 (Ala. 1976). Defendant Bibb is

---

[3]Plaintiffs' complaint also asserts claims of negligence, wantonness, and breach of warranty. Even if these claims were stated against defendant Bibb, which they are not, plaintiffs have not and can not show that these causes of action are not subsumed by AEMLD. *See e.g., Veal v. Teleflex, Inc.*, 586 So.2d 188, 190-191 (Ala.1991) (Plaintiff's defective product claim held to be a claim under AEMLD and, thus, trial court did not err in refusing to charge the jury on negligence and wantonness.); *Pitts v. Dow Chemical Co.*, 859 F.Supp. 543, 550-51 (M.D.Ala.1994) (Plaintiff's negligence claim related to an alleged unreasonably unsafe product held not to state a claim distinct from AEMLD.). *See also McClain v. Metabolife International, Inc.*, 193 F.Supp.2d 1252, 1256 (N.D.Ala.2002).

clearly not a manufacturer, supplier, or seller of dishwashers who markets said product. At most, he is a sales representative for the seller, defendant Sears.[4]  *See Brock v. Baxter Healthcare Corp.*, 96 F.Supp.2d 1352, 1356; citing *Casrell*, 335 So.2d at 132-33.  As defendant Bibb is not a manufacturer, distributor or seller of the dishwasher at issue, the court finds that the plaintiffs have failed to state a claim upon which relief can be granted against this defendant under the AEMLD.

For fraudulent suppression, the plaintiffs must show that the defendant (1) had a duty to disclose an existing material fact; (2) that the defendant suppressed that existing material fact; (3) that the defendant had actual knowledge of the fact; (4) that the defendant's suppression of the fact induced the plaintiff to act or refrain from acting; and (5) that the plaintiff suffered actual damage as a proximate result of acting or not acting.  *Spain v. Brown & Williamson Tobacco*; 230 F.3d 1300, 1311 (11th Cir.2000); citing *Ex Parte Household Retail Services*, 744 So.2d 871, 879 (Ala.1999).

A party's mere silence as to a material fact does not constitute fraud unless that party is under a duty to disclose that fact. *State Farm Fire and Casualty Co. v. Owen*, 729 So.2d 834, 837 (Ala.1998). A duty to disclose can arise either from a confidential relationship with the plaintiff or from the particular circumstances of the case. *Keck*

---

[4]A seller is one who is engaged in the business of selling that type product. *See, e.g.*, *Brock v. Baxter Healthcare Corp.*, 96 F.Supp.2d 1352, 1356 (S.D.Ala.2000).

*v. Dryvit Systems, Inc.*, 830 So.2d 1, 11 (Ala.2002); citing § 6-5-102, Ala.Code 1975;

*Ex parte Farmers Exchange Bank*, 783 So.2d 24, 27 (Ala.2000). Plaintiffs rely on

*McClain v. Metabolife International, Inc.*, 193 F.Supp.2d 1252 (N.D.Ala.2002) for the

proposition that fraud claims made in addition to AEMLD claims survive a motion to

dismiss. *See id.* at 1256-1257. However, in that case only the manufacturer was

named as a defendant. Similarly, in the other case upon which plaintiffs rely, *Lowe*

*v. Metabolife*, 206 F.Supp.2d 1195 (S.D.Ala.2002), an individual salesperson was not

sued. Thus, that court's holding that the fraud claim could survive a motion to dismiss

is not relevant to the issue before this court.

  Defendants dispute that defendant Bibb had any duty to disclose anything to the

plaintiffs at all. The plaintiffs do not allege any particular relationship with defendant

Bibb which would have placed on him a duty to disclose a material fact. They also

do not allege that they relied on any statement of defendant Bibb to purchase the

dishwasher in question.[5] In fact, they do not even allege that defendant Bibb stated

the dishwasher was safe. Plaintiffs state no fact allegedly known by Bibb, which he

had a duty to disclose but failed to do so.[6] Rather, they merely ask this court to rule

---

[5] In fact, plaintiffs allege only that defendant Bibb "suppressed information that he knew or should have known regarding the fire causing potential of the dishwasher ...." Complaint. ¶ 13.

[6] Plaintiffs do not even allege that defendants Sears or Whirlpool had knowledge of a defect in the dishwasher they purchased at the time they purchased it (or ever). Given no such

that an individual salesman for a large company, who may or may not have done any more than ring up a sale for the plaintiffs, should be liable for an alleged defect in the product which does not manifest itself for more than three years. The court declines to extend such liability here.

Even assuming this court was willing to place a duty to disclose upon the individual defendant, Rule 9 of the Alabama Rules of Civil Procedure requires that fraud be alleged "with particularity." *Smith v. National Sec. Ins. Co.*, 2003 WL 1787934, *3 (Ala.April 4, 2003); citing *Garrett v. Raytheon Co.*, 368 So.2d 516 (Ala.1979). Under Rule 9(b), A.R.C.P., the pleading must show the time, place and the contents or substance of the false representations, the facts misrepresented, and an identification of what has been obtained. *Smith*, 2003 WL 1787934, *3. *See also Allstate Ins. Co. v. Ware* , 824 So.2d 739, 742 (Ala.2002). Thus, under Rule 9, A.R.C.P., for a pleading to state a claim of fraud, "[t]he pleading must show [the] time, [the] place, and the contents or substance of the false representations, the facts misrepresented, and an identification of what has been obtained." *Bethel v. Thorn*, 757 So.2d 1154, 1158 (Ala.1999); citing *Lester*, 622 So.2d at 311 (quoting *Miller v. Mobile County Board of Health*, 409 So.2d 420, 422 (Ala.1981) (quoting the

---

allegation, the plaintiffs do not allege any basis by which defendant Bibb would have such knowledge. Without that, he could have no duty to disclose.

Committee Comments to Rule 9(b))) (alterations in Lester ); *see also Robinson v. Allstate Ins. Co.*, 399 So.2d 288, 290 (Ala.1981) ("The pleader must state the time, the place, the contents or substance of the false representations, the fact misrepresented, and an identification of what has been obtained.").

The court, having reviewed the allegations set forth in Counts I and VI of the plaintiffs' complaint, finds the allegations fail to state a cause of action against the resident defendant. The fact that defendant Bibb, acting on behalf of defendant Sears, sold the plaintiffs a dishwasher which caught fire three and a half years later, is, in and of itself, insufficient to state a cause of action. The plaintiffs need not have a winning case against the allegedly fraudulent defendant; they need only have a possibility of stating a valid cause of action in order for the joinder to be legitimate. *Triggs*, 154 F.3d at 1287. That possibility does not exist in the pleadings before this court.

The court having considered the foregoing, finds find that the joinder was fraudulent and that defendant Bibb's motion to dismiss is due to be **GRANTED**. The court shall so order.

DONE this the ___ day of May, 2003.

INGE P. JOHNSON
UNITED STATES DISTRICT JUDGE

9

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

NELLIE BOWMAN,                          )
                                        )
            Plaintiff,                  )
                                        )        CIVIL ACTION NO.
    v.                                  )
                                        )        96-0448-P-C
COLEMAN COMPANY, INC., et al.,          )
                                        )
            Defendants.                 )
                                        )

## REPORT AND RECOMMENDATION

Plaintiff Nellie Bowman ("Ms. Bowman") has filed a motion to remand this action to the

Circuit Court of Mobile County, Alabama on the ground that removal was improvidently granted

(tab 7). In a motion addressing the same substantive issues, defendant Michael Elkins ("Mr.

Elkins") has moved for dismissal of all claims asserted against him by the plaintiffs (tab 3). These

motions have been referred to the undersigned for a report and recommendation pursuant to 28

U.S.C. § 636(b)(1)(B) and Local Rule 26. After careful consideration of the arguments raised by

the parties in their briefs and at oral argument, the Court recommends that the motion to remand

be **DENIED** and the motion to dismiss be **GRANTED** for the reasons set forth below.

I.  Factual Background[1]

On November 3, 1995, the plaintiff's son, Andrew Bowman ("Mr. Bowman"), purchased a

Coleman PowerMate, 17,000 BTU, propane radiant heater, Model No. 5017-751T, at a Lowe's

---

[1]For the purposes of the motions being considered, the facts are construed in the light
most favorable to the plaintiff. *See* *Coker v. Amoco Oil Co.*, 709 F.2d 1433, 1440 (11th Cir.
1983) (in considering fraudulent joinder issue, questions of fact must be assessed in plaintiff's
favor); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (in summary judgment
context, court considers all inferences drawn from underlying facts in light most favorable to
nonmovant).



retail store L. Mobile, Alabama. Because he was dissatisfied with a similar heater which had not functioned properly, Mr. Bowman spoke with Mr. Elkins, the Lowe's store manager, about the possibility of exchanging his old heater for a new one. Mr. Elkins agreed to allow Mr. Bowman to exchange his malfunctioning heater for the Coleman heating unit which is the subject of this lawsuit. Prior to the sale of the new heater, Mr. Elkins allegedly advised Mr. Bowman that the Coleman unit was a good heater and that Mr. Bowman would not experience any problems with it. On February 3, 1996, the plaintiff sustained severe burns when the Coleman PowerMate heater which her son had purchased at Lowe's on Mr. Elkins' verbal endorsement allegedly malfunctioned.

On March 26, 1996, Ms. Bowman filed the instant lawsuit against defendants Coleman Company, Inc. ("Coleman"), Lowe's Home Centers, Inc. ("Lowe's"), and Mr. Elkins in the Circuit Court of Mobile County, Alabama. On May 10, 1996, the defendants removed this action to federal court pursuant to 28 U.S.C. §§ 1441 et seq. In their notice of removal, defendants indicated that federal subject matter jurisdiction was predicated on diversity of citizenship. The plaintiff now seeks remand of this action to state court on the ground that this Court lacks diversity jurisdiction. Defendant Mr. Elkins has also moved for dismissal of all causes of action raised against him. Pursuant to Rule 12(b), Fed.R.Civ.Pro., the Court is construing the motion to dismiss as a motion for summary judgment under Rule 56, Fed.R.Civ.Pro. Both motions have been thoroughly briefed, and oral argument was held before the undersigned on June 3, 1996.

II. Legal Analysis

A. *Fraudulent Joinder of Defendant Mr. Elkins*

The merits of plaintiff's motion to remand hinge on the presence or absence of complete

2

diversity of ...zenship in this action. See 28 U.S.C. § 1332(a) (conferring upon federal district courts original jurisdiction over actions between citizens of different states where amount in controversy exceeds $50,000). It is well-established that diversity jurisdiction requires complete diversity of citizenship, such that no party on one side of a controversy may be a citizen of the same state as any party on the other side. See, e.g., Tapscott v. MS Dealer Service Corp., 77 F.3d 1353, 1359 (11th Cir. 1996); Cabalceta v. Standard Fruit Co., 883 F.2d 1553, 1557 (11th Cir. 1989). In the case at bar, it is undisputed that the plaintiff is a citizen of Alabama, while defendant Coleman is a Kansas corporation with its principal place of business in Kansas and defendant Lowe's is a North Carolina corporation with its principal place of business in North Carolina. Defendant Mr. Elkins is a citizen of Alabama. Despite the lack of diversity between the plaintiff and Mr. Elkins, the defendants removed this action on the ground that Mr. Elkins' citizenship should not be considered because he was fraudulently joined as a defendant.

The presence of a non-diverse party who has been fraudulently joined does not destroy a federal court's diversity jurisdiction over an action. See Tapscott, 77 F.3d at 1359; Coker v. Amoco Oil Co., 709 F.2d 1433, 1440 (11th Cir. 1983). A defendant is considered fraudulently joined if there is "no possibility the plaintiff can establish any cause of action against the resident defendant."[1] Cabalceta, 883 F.2d at 1561; Autrey v. United Companies Lending Corp., 872 F. Supp. 925, 929 (S.D. Ala. 1995). As the parties seeking removal, the defendants bear the burden of proving that there is no possibility that a state court would find the plaintiff's complaint to state

---

[1] A second avenue for establishing fraudulent joinder exists where the plaintiff has fraudulently pled jurisdictional facts in order to bring a resident defendant into state court. See Tapscott, 77 F.3d at 1360 n.17; Cabalceta, 883 F.2d at 1561. The defendants in this case have not alleged fraud in the pleading of jurisdictional facts; therefore, this means of establishing fraudulent joinder is not applicable here.

a cause of action against Mr. Elkins, and that Mr. Elkins' joinder in this matter was therefore fraudulent. See Cabalceta, 883 F.2d at 1561; Lane v. Champion International Corp., 827 F. Supp. 701, 707 (S.D. Ala. 1993) (declaring that removing party must establish fraudulent joinder by clear and convincing evidence). In ruling on this issue, the district court must assess all questions of fact and controlling law in favor of the plaintiff. See id.; Coker, 709 F.2d at 1440.

### 1. Plaintiff's Claims Under AEMLD

The first cause of action asserted against Mr. Elkins in the complaint is a claim under the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD"). A plaintiff can invoke the AEMLD only as to manufacturers and sellers of allegedly defective products. See Turner v. Azalea Box Co., 508 So.2d 253, 254 (Ala. 1987). The Alabama Supreme Court recently summarized the criteria which a plaintiff must satisfy in order to maintain an AEMLD action against a seller of a product as follows:

> "To establish liability under the AEMLD, the plaintiff must show that he suffered an injury caused by one who sold a product in a defective condition unreasonably dangerous to the plaintiff as the ultimate user or consumer; that the seller was engaged in the business of selling such a product; and that the product was expected to, and did, reach the user without substantial change in the condition in which it was sold." Carter v. Cantrell Machine Co., Inc., 662 So.2d 891, 892 (Ala. 1995) (citing Sapp v. Beech Aircraft Corp., 564 So.2d 418 (Ala. 1990)).

An obvious threshold inquiry to a finding of AEMLD liability is a determination of whether a particular defendant may be labeled a "seller" of a product. The defendants argue vigorously that Mr. Elkins cannot properly be deemed a seller of the Coleman heater purchased by Mr. Bowman. Because Mr. Elkins was an employee of Lowe's, defendants contend, he was merely an agent of the seller and therefore cannot be liable under the AEMLD. In response, the plaintiff asserts that it is incongruous at best for the defendants to contend that Mr. Elkins, a

4

salesperson by trade, should not be considered a seller under the AEMLD.

Alabama courts have not addressed the question of whether a retail store employee may properly be considered as seller of a product, for AEMLD purposes.[3] However, several other jurisdictions have faced similar questions in analogous circumstances. For example, in Memphis Bank & Trust Co. v. Water Services, Inc., 758 S.W.2d 525 (Tenn. 1988), the Tennessee Supreme Court examined whether a salesman for a manufacturer of a water treatment device could be deemed a "seller" or a "manufacturer" for products liability purposes. In that case, the court set aside a judgment against the salesman, pursuant to the following findings:

> "[The individual defendant] is shown by the uncontradicted evidence in this case to be a sales representative of the corporate defendant. On all sales made for his employer he was paid a commission. He was neither a stockholder, a director nor an officer of the corporate defendant, insofar as the record shows. The corporation is clearly both a 'manufacturer' and a 'seller'. [The individual] defendant] was neither." Id. at 526.

Likewise, in Musser v. Vilsmeier Auction Co., 562 A.2d 279 (Pa. 1989), the Pennsylvania Supreme Court held that an auctioneer is not a "seller" for the purposes of establishing products liability. In support of this decision, that court reasoned that the auctioneer was simply "the means of marketing" the product, and that he was "not equipped to pass upon the quality of the myriad [] products he is called upon to auction". Id. at 282; see also Tauber-Arons Auctioneers Co., Inc. v. Superior Court for County of Los Angeles, 161 Cal.Rptr. 789, 798 (Cal.App.2 Dist. 1980) (finding that auctioneer cannot be liable under strict products liability where auctioneer is a marketer who played "no more than a random and accidental role" in the distribution of a

---

[3]At oral argument, the plaintiff directed the Court's attention to Caudle v. Partridge, 566 So.2d 244 (Ala. 1990), in which an individual seller was held liable under the AEMLD. However, the individual's liability in Caudle was predicated on his status as a sole proprietor, not as a salesman; therefore, the Caudle decision is inapposite.

5

defective product). More importantly, the <u>Musser</u> court observed that:

> "Sellers may sell in any fashion they choose: sky writing, signs, handbills, electronic media or any method to suit their purpose, including auction. When they do they remain liable and the agents of their method are but agents and extensions of their enterprise [and are not liable]." <u>Musser</u>, 562 A.2d at 283.

Though cases like <u>Memphis Bank</u> and <u>Musser</u> originate in and apply the law of other jurisdictions, they strongly suggest that Mr. Elkins cannot be considered a "seller" under AEMLD.[4]

More generally, the applicable case law is clear that the policy aims of strict products liability for sellers would not be furthered by sweeping individuals such as Mr. Elkins within the doctrine's ambit. Indeed, in creating the AEMLD, Alabama's high court explained its intention to place "the burden to compensate for loss incurred by defective products on the one best able to prevent the distribution of those products." <u>Atkins v. American Motors Corp.</u>, 335 So.2d 134, 139 (Ala. 1976). This rationale is consistent with the policy justifications articulated by numerous other state courts for expanding products liability to embrace all entities within the distributive chain of a defective product. For example, in <u>Nutting v. Ford Motor Company</u>, 584 N.Y.S.2d 653, 657 (N.Y.A.D.3 Dept. 1992), a New York court observed that the policy considerations for seller liability included the following:

> "[T]he ability of the seller, because of its continuing relationship with the manufacturer, to exert pressure for the improved safety of products and to recover

---

[4] This view is further bolstered by the fact that numerous jurisdictions have held that liability in a products liability case should extend only to those in the distributive chain through which products travel in order to reach the market. <u>See, e.g.</u>, <u>Parker v. St. Vincent Hospital</u>, 919 P.2d 1104 (N.M. App. 1996); <u>Dunn v. Kanahwa County Board of Education</u>, 459 S.E.2d 151 (W.Va. 1995); <u>Daly v. General Motors Corp.</u>, 575 P.2d 1162, 1170 (Cal. 1978); <u>Embs v. Pepsi-Cola Bottling Co. of Lexington, Kentucky, Inc.</u>, 528 S.W.2d 703, 705 (Ky. 1975); <u>Allison Steel Mfg. Co. v. Superior Court of Maricopa County, Division Three</u>, 511 P.2d 198, 202 (Ariz.App. 1973). While a salesman may be an agent of an entity in the distributive chain, the salesman himself is not a part of such a chain.

increased costs within their commercial dealings, or through contribution or indemnification in litigation; additionally, by marketing the products as a regular part of their business such sellers may be said to have assumed a special responsibility to the public, which has come to expect them to stand behind their goods." Id. at 657 (quoting Sukljian v. Charles Ross & Son Co., 503 N.E.2d 1358 (N.Y. 1986)); see also Crowe v. Public Building Commission of Chicago, 370 N.E.2d 32, 34 (Ill.App. 1 Dist. 1977) (supplier liability for defective products is driven by general considerations of justice which dictate that those who create the risk and reap the profit should also bear the loss); Kasel v. Remington Arms Co., 101 Cal. Rptr. 314, 323 (Cal.App. 2 Dist. 1972) (sellers are held liable because they have participatory connection, for personal profit or other benefit, with the injury-causing product and with the enterprise that created consumer demand for and reliance on the product).

Mr. Elkins is an employee of a corporate defendant. In his position as store manager, he has no authority to compel or prevent the distribution of particular products by Lowe's, for such product distribution decisions are vested in the Lowe's home office, rather than in its individual store managers. See Elkins Deposition, at 34-35, 74. While Lowe's likely has accumulated sufficient market power to exert pressure on manufacturers to improve the safety of their products, Elkins has not. Likewise, it is Lowe's, and not Mr. Elkins, who reaps the profit from the distribution of products such as the Coleman heater; therefore, it is Lowe's, and not Mr. Elkins, who should be required to bear the risk of such products being defective.[5] Finally, Lowe's has a participatory market connection with Coleman, through which avenue Lowe's may be able to recoup the increased costs which it incurs as a result of seller liability. Mr. Elkins does not. In short, the policy goals underlying the AEMLD would not be advanced in any way by holding

---

[5]Mr. Elkins is a salaried employee of Lowe's. See Elkins Deposition, at 12. Although Lowe's does have an employee bonus program based, in part, on store profits, there is no evidence that this program would allow Mr. Elkins to reap any appreciable share of Lowe's profits earned from the distribution of defective products. The Court is of the opinion that a simple employee bonus plan, without more, is insufficient to activate the policy considerations of aligning profits and risks which underlie seller liability in the AEMLD context.

7

persons such as Mr. Elkins liable in their role as store managers or sales representatives.

In light of the foregoing analysis, the Court believes that neither the applicable case law nor the policy objectives articulated by Alabama and other state courts can support the extension of the AEMLD to encompass salespersons, store managers, or other agents of a retailer. Accordingly, the undersigned is of the opinion that there is no possibility that Ms. Bowman could successfully assert her AEMLD claim against Mr. Elkins in state court.

### 2. Plaintiff's Negligence/Wantonness Claims

The remaining causes of action advanced against Mr. Elkins in the complaint are negligence and wantonness claims. In particular, the plaintiffs allege that the store manager's actions were negligent and wanton inasmuch as he knew or should have known that the Coleman heater sold to Mr. Bowman was unsafe.[6] Defendants contend that there is no possibility that Ms. Bowman could assert these causes of action against Mr. Elkins in state court.

To recover in a negligence or wantonness action, a plaintiff must establish the following elements: "(1) a duty owed by the defendant to the plaintiff; (2) a breach of that duty; and (3) an injury to the plaintiff as a result of that breach."[7] Kelly v. M. Trigg Enterprises, Inc., 605 So.2d

---

[6]According to the plaintiff, Mr. Elkins knew or should have known the heating unit was unsafe because it lacked a regulator and because there was no indication on its container that it had been approved by any independent testing laboratory.

[7]The criteria listed here are shared by both negligence and wantonness actions. In addition to those elements listed above, a party seeking to recover on a wantonness theory must also show that the defendant's omission of a duty was done with knowledge and consciousness of the likelihood of injury which would result from such an omission. See Lynn Strickland Sales and Service, Inc. v. Aero-Lane Fabricators, Inc., 510 So.2d 142, 145 (Ala. 1987) (wantonness characterized by state of mind in which duty was omitted); Tyler v. City of Enterprise, 577 So.2d 876, 877 (Ala. 1991) (both negligence and wantonness claims require showing that defendant owed duty).

8

1185, 1190 (Ala. 1992) (quoting Hall v. Thomas, 564 So.2d 936, 937 (Ala. 1990)). Defendants argue that the plaintiff's negligence and wantonness claims against Mr. Elkins must fail because he owed her no duty of care. See Ledbetter v. United American Ins. Co., 624 So.2d 1371, 1373 (Ala. 1993) (whether there is duty is threshold inquiry in negligence case). In response, the plaintiff articulates three separate duties which Mr. Elkins allegedly owed to her: (1) a duty to prevent an unsafe product from entering the stream of commerce; (2) a duty to warn of the dangerous nature of a product; and (3) a duty to be careful not to hurt others.

With respect to the first alleged duty, it is clear that Mr. Elkins lacked the authority from Lowe's to prevent the Coleman heater from entering the stream of commerce. As stated above, Lowe's, and not Mr. Elkins, was responsible for deciding which products to distribute at the Mobile store. Plaintiff cites no authority for the proposition that a salesman or store manager owes customers a duty to prevent unsafe products from entering the stream of commerce.[8] Moreover, the recognition of such a duty would impose strict products liability on persons such as Mr. Elkins based on an employer's decision to market a certain product. As a practical matter, this rule would result in salespeople with no control over product marketing or distribution decisions being declared negligent for those decisions. Under Alabama law, "the duty issue is essentially a public policy question, i.e., whether the law should impose a requirement on the defendant that it do or refrain from doing some act for the safety and well-being of the plaintiff." Buchanan v. Merger Enterprises, Inc., 463 So.2d 121, 125-26 (Ala. 1984). Clearly, no public policy interest would be advanced by holding a salesperson liable in negligence for a corporate

---

[8]By the time the products reach the salesman, they have already entered the stream of commerce. The salesman simply acts as a marketing medium, an agent of his employer, in disseminating the goods.

9

decision into which he had no input and over which he had no control. The undersigned is of the opinion that Mr. Elkins owed Mr. Bowman no duty to prevent harmful products from entering the stream of commerce.

Second, the plaintiff asserts that Mr. Elkins owed her a duty to warn of the dangerous nature of the product. In support of this argument, Ms. Bowman cites Caudle v. Partridge, 566 So.2d 244, 247 (Ala. 1990), in which the Alabama high court stated that manufacturers and sellers have a duty to warn the public about products which they know or should know to be dangerous. See id. As indicated previously, Mr. Elkins is neither a seller nor a manufacturer; therefore, the Caudle decision does not impose any such duty to warn on him.[8]

Third and finally, Ms. Bowman invokes the general duty imposed by Alabama law on all persons to be careful not to hurt others. See Smitherman v. McCafferty, 622 So.2d 322, 324 (Ala. 1993); Southeastern Greyhound Lines v. Callahan, 13 So.2d 660, 663 (Ala. 1943). While Alabama courts do recognize such a general duty, they also state that the determination of whether this duty exists in a particular context should be based on the consideration of "a number of factors, including public policy, social considerations, and foreseeability." Smitherman, 622 So.2d at 324. For the reasons outlined previously, neither public policies nor social

---

[8]It is true that an individual may voluntarily shoulder a duty to inspect a product, in which case a duty to warn would arise. See Adams v. Travelers Insurance Co., 494 So.2d 401, 403-04 (Ala. 1986). However, the uncontroverted evidence is that Mr. Elkins undertook no such voluntary duty and, indeed, lacked the training and expertise to perform inspections of Lowe's products. See Elkins Deposition, at 15-16, 33-34, 75-76. As a result, Adams cannot serve as a basis for finding that Mr. Elkins owed Mr. Bowman a duty to warn about the unsafe nature of the Coleman heater which he purchased. Accord Cook v. Safeway Stores, Inc., 330 P.2d 375, 376 (Okla. 1958) (store clerk owes duty to supply customers wholesome food only where clerk has knowledge of unfitness or assumes duty to inspect food); Crosby v. Calaway, 16 S.E.2d 155, 159 (Ga.App. 1941) (same).

P.11

OCT-31-2002  14:36

consideration... would be furthered by the imposition of a duty of care on Mr. Elkins in this case. Moreover, the undersigned is of the opinion that the dangerous nature of the heater was not foreseeable to Mr. Elkins, who did not possess the training, expertise, background, or responsibility to inspect or test products such as the Coleman heater for defects. Therefore, the undersigned is of the opinion that no general duty of care is applicable in this case.

As this analysis demonstrates, it is evident that Mr. Elkins owed Ms. Bowman no duty which could give rise to personal liability on a negligence or wantonness theory. Hence, the undersigned believes that there is no possibility that the plaintiff could maintain such negligence or wantonness claims in state court. Given the Magistrate Judge's previous recommendations with respect to the AEMLD claims, the undersigned is of the opinion that the plaintiff fraudulently joined Mr. Elkins in this action, as there is no possibility that she could successfully interpose any of her claims against him in state court. Because Mr. Elkins has been fraudulently joined, his citizenship is immaterial for the purposes of evaluating the presence or absence of diversity jurisdiction in federal court. Complete diversity exists among the remaining parties. It is therefore the recommendation of the undersigned that the plaintiff's motion to remand be DENIED on the ground that there is complete diversity of citizenship among all parties properly joined and served in this litigation and that federal jurisdiction properly lies.

. B. *Mr. Elkins' Motion to Dismiss*

By order dated July 11, 1996, this Court advised the parties that it would construe Mr. Elkins' motion to dismiss as a motion for summary judgment. The undersigned is of the opinion that the foregoing recommendation on the fraudulent joinder issue effectively disposes of the summary judgment issue, as well. Indeed, the undersigned has already determined that there is no

11

possibility . . . the plaintiff could pursue any of her state law claims against Mr. Elkins in state court. There being no possibility of relief, it necessarily follows that there can be no genuine issue of material fact with respect to any of plaintiff's claims against Mr. Elkins. Therefore, the Magistrate Judge believes that Mr. Elkins is entitled to judgment as a matter of law with respect to all of those claims, pursuant to Rule 56(c), Fed.R.Civ.Pro. Accordingly, the undersigned recommends that Mr. Elkins' motion for dismiss, which was treated as a motion for summary judgment, be GRANTED and that the claims against him be DISMISSED with prejudice.

III.  Conclusion

For all of the foregoing reasons, the undersigned recommends that the plaintiff's motion to remand this action to the Circuit Court of Mobile County, Alabama, be DENIED, and that defendant Elkins' motion to dismiss be GRANTED and the claims asserted against him be DISMISSED with prejudice.

The attached sheet contains important information regarding objections to the report and recommendation of the Magistrate Judge.

DONE this the 3rd day of September, 1996.

WILLIAM E. CASSADY
UNITED STATES MAGISTRATE JUDGE

MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS AND
RESPONSIBILITIES FOLLOWING RECOMMENDATION, AND
FINDINGS CONCERNING NEED FOR TRANSCRIPT

1.   Objection.  Any party who objects to this recommendation or
anything in it must, within ten days of the date of service of this
document, file specific written objections with the Clerk of this
court.  Failure to do so will bar a de novo determination by the
district judge of anything in the recommendation and will bar an
attack, on appeal, of the factual findings of the Magistrate Judge.
See 28 U.S.C. § 636(b)(1)(C); Lewis v. Smith, 855 F.2d 736, 738
(11th Cir. 1988); Nettles v. Wainwright, 677 F.2d 404 (5th Cir.
Unit B, 1982) (en banc).  The procedure for challenging the findings
and recommendations of the Magistrate Judge is set out in more
detail in Local Rule 26(4)(b), which provides that:

> Any party may object to a magistrate judge's proposed
> findings, recommendations or report made under 28 U.S.C.
> § 636(b)(1)(B) within ten (10) days after being served
> with a copy thereof.  The appellant shall file with the
> Clerk, and serve on the magistrate judge and all parties,
> written objections which shall specifically identify the
> portions of the proposed findings, recommendations or
> report to which objection is made and the basis for such
> objections.  A judge shall make a de novo determination
> of those portions of the report or specified proposed
> findings or recommendation to which objection is made and
> may accept, reject, or modify in whole or in part, the
> findings or recommendations made by the magistrate judge.
> The judge, however, need conduct a new hearing only in
> his discretion or where required by law, and may consider
> the record developed before the magistrate judge, making
> his own determination on the basis of that record.  The
> judge may also receive further evidence, recall witnesses
> or recommit the matter to the magistrate judge with
> instructions.

A Magistrate Judge's recommendation cannot be appealed to a
Court of Appeals; only the District Judge's order or judgment can
be appealed.

2.   Transcript (applicable Where Proceedings Tape Recorded).
Pursuant to 28 U.S.C. § 1915 and FED.R.CIV.P. 72(b), the Magistrate
Judge finds that the tapes and original records in this case are
adequate for purposes of review.  Any party planning to object to
this recommendation, but unable to pay the fee for a transcript, is
advised that a judicial determination that transcription is
necessary is required before the United States will pay the cost of
the transcript.

UNITED STATES MAGISTRATE JUDGE

## JURY AWARDS IN AEMLD CASES

$510,000
(Compensatory)
$10,000,000
(Punitive)

Hobart Corporation v. Scottie W. Scoggins, 776 So. 2d 56 (Ala. 2000) (products liability action by a man who was injured while using a meat saw manufactured by Hobart)

$2,500,000
(Compensatory)
$500,000
(Punitive)

Cessna Aircraft Company v. Robert Trzcinski, 682 So. 2d 17 (Ala. 1996) (products liability action by a man who was injured in an airplane crash due to a defective shoulder harness)

$1,000,000
(Original verdict)
$825,000

Uniroyal Goodrich Tire Company v. Jackie Darryl Hall, 681 So. 2d 126 (Ala. 1996) (products liability action by a man who was injured when wheel rim exploded)

$1,225,000

Ford Motor Company v. June Burdeshaw, 661 So. 2d 236 (Ala. 1995) (wrongful death case brought against truck manufacturer after decedent was killed by a truck's transmission slipping out of neutral and crushing him)

$13,000,000

General Motors Corporation v. Pamela L. Saint, 646 So. 2d 564 (Ala. 1994) (products liability action by a woman who was injured due to a defective seat belt)

$250,000
($100,000-comp)
($150,000-pun.)

Flagstar Enterprises, Inc. v. Maureen Davis, 709 So. 2d 1132 (Ala. 1998) (products liability action by a woman who found human blood in styrofoam package containing biscuit with gravy)

$250,000

Caterpillar, Inc. v. Hightower, 605 So. 2d 1193 (Ala. 1992) (product liability action brought by a man who was injured by broken tree trunk while handling machinery during logging operations)

$115,000

Banner Welders, Inc. v. Knighton, 425 So. 2d 441 (Ala. 1982) (product liability claim against manufacturer for personal injuries received on shuttle welder)

$6,500,000

Sears, Roebuck & Co. v. Harris, 630 So. 2d 1018 (Ala. 1993) (wrongful death case based on product liability claims against manufacturer and retailer of gas water heater that caused carbon monoxide poisoning)

$7,500,000

General Motors Corp. v. Johnston, 592 So. 2d 1054 (Ala. 1992) (wrongful death case based on product liability claim where child was killed in automobile accident)

$5,000,000

Industrial Chem. & Fiberglass Corp. v. Chandler, 547 So. 2d 812 (Ala. 1989) (widows of two workers killed in industrial accident brought wrongful death action against distributor of cleaning substances that ignited and caused death of workers)

$2,800,000

General Motors Corp. v. Edwards, 482 So. 2d 1176 (Ala. 1985) (wrongful death case based on products liability claim where two boys were killed in automobile accident)

$200,000

Interstate Engineering Inc. v. Burnett, 474 So. 2d 624 (Ala. 1985) (wrongful death case brought against manufacturer of heat detectors after decedent was killed in a fire)

$800,000

Piper Aircraft Corp. v. Evans, 424 So. 2d 586 (Ala. 1982) (damages in wrongful death case based on product liability claims against airplane manufacturer where decedent was killed in plane crash)

$500,000

Caterpillar Tractor Co. v. Ford, 406 So. 2d 854 (Ala. 1981) (wrongful death case based on product liability claims where decedent was killed in an accident on a tractor manufactured by defendant)